## P. K. HOLMES v. THE STATE.

No. 1232. Decided February 14, 1912.

Rehearing granted October 30, 1912.

**1.—Murder—Evidence—Declaration of Third Party.**

Where, upon trial of murder, the difficulty arose from the relations between defendant and the sister of deceased, there was no error in not admitting testimony as to the declarations of a third party to the father of the deceased which rendered it possible or probable that another person than defendant had also had sexual intercourse with the sister of the deceased, it not being shown that defendant had any knowledge of this conversation prior to the shooting, and said testimony not being admissible or offered as impeaching said State's witness, who was the father of the deceased. Davidson, Presiding Judge, dissenting.

**2.—Same—Discretion of Court—Argument of Counsel—Statutes Construed.**

Where it was contended that the court did not give sufficient time to defendant's counsel to present his side of the case, and there was no showing that the court abused his discretion in limiting the argument of counsel, under article 705, Code Criminal Procedure, and no injury was shown, and appellant's bill of exceptions did not disclose that his counsel even used the time allotted to them, there was no reversible error.

**3.—Same—Discretion of Court—Discussion of the Law.**

It is a matter within the discretion of the court whether the authorities on questions of law shall be presented to the court in the presence of the jury, and this discretion will not be revised on appeal unless it has been abused to the prejudice of the defendant.

**4.—Same—Charge of Court—Bill of Exceptions—Practice on Appeal.**

Where it did not appear on appeal, either by bills of exception or motion for new trial, that any reason was assigned why the court erred in failing to give a requested charge, the same can not be reviewed. Following Ryan v. State, 64 Texas Crim. Rep., 628, and other cases.

**5.—Same—Motion for New Trial—Practice on Appeal.**

The rule adopted by this court is that the motion for new trial must so definitely specify the reasons why a special charge should have been given as to direct the attention of this court to the precise error of which complaint is made, and no reason not so specified can be urged on appeal; and attorneys can not proceed in this regard under the rules in civil cases.

**6.—Same—Assignments of Error—Civil Cases.**

In civil cases the motion for new trial merely states that the court erred in a certain paragraph of his charge, and then in the assignments of error, filed later on, the claimed error is pointed out under certain propositions; this is not the rule in criminal cases, but everything must be stated in the motion for new trial.

**7.—Same—Evidence—Moral Turpitude.**

Where, upon trial of murder, the State was permitted to introduce in evidence certain indictments to show that the defendant was charged with certain misdemeanors not involving moral turpitude, the error was not of

Vol. LXVIII Crim.—2.

such nature as to work a reversal of the case, as the witness' testimony was upon an immaterial matter; yet such practice was improper and should not reoccur.

### 8.—Same—Charge of Court—Weight of Evidence.

Where, upon trial of murder, all the witnesses agreed that the large wound in the right breast or side of deceased was the one, and the only one, that could have caused death, there was no reversible error that the court submitted the case solely on this wound and left the question of fact to the jury as to whether defendant inflicted it.

### 9.—Same—Charge of Court—Reasonable Doubt—Charge as a Whole.

Where, upon trial of murder, the court instructed the jury that if someone else than defendant fired, etc., to acquit, and also in another portion of the charge submitted the reasonable doubt as to whether defendant fired the shot, there was nothing in the contention that the court had not submitted the reasonable doubt; when the charge was considered as a whole.

### 10.—Same—Charge of Court—Reasonable Doubt.

Where, upon appeal from a conviction of manslaughter, it appeared that the court attempted to define reasonable doubt instead of instructing the jury in the language of the statute, while not reversible error, yet it is better practice to charge the language of the statue, and not define the meaning of the words.

### 11.—Same—Bill of Exceptions.

In the absence of a bill of exceptions showing that the court below lectured the jury, etc., the matter can not be reviewed on appeal.

### 12.—Same—Charge of Court—Manslaughter.

Where the indictment charged the defendant with retaining liquors with charge on manslaughter, and the court's charge in this respect, when taken as a whole, was not subject to said criticism, and the jury found defendant guilty of manslaughter and assessed the lowest punishment, there was no reversible error.

### 13.—Same—Charge of Court—Self-Defense—Place of Safety.

Where, upon trial of murder, defendant was convicted of manslaughter, and it did not appear from the evidence that defendant after firing the first shots to relieve himself of illegal restraint had reached a place of safety and voluntarily returned to the conflict, when he fired the fatal shot, the court should have submitted a charge on self-defense.

Appeal from the District Court of Ward. Tried below before the Hon. S. J. Isaacks.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*J. F. McKenzie* and *J. E. Starley* and *W. A. Hudson,* for appellant.—On question of moral turpitude: Cecil v. State, 100 S. W. Rep., 390; Pollok v. State, 101 S. W. Rep., 231; Casey v. State, 50 Texas Crim. Rep., 392, 97 S. W. Rep., 496; Bowers v. State, 71 S. W. Rep., 284; Busby v. State, 48 Texas Crim. Rep., 83, 86 S. W. Rep., 1032.

On question of the court's failure to charge on self-defense: Swain v. State, 48 Texas Crim. Rep., 98, 86 S. W. Rep., 335; Glover v. State, 26 S. W. Rep., 204; Bedford v. State, 38 S. W. Rep., 210;

Jackson v. State, 15 Texas Crim. App., 84; Bell v. State, 17 id., 538; Carter v. State, 17 S. W. Rep., 1102.

On question of the court's charge on the weight of the evidence: Pannell v. State, 54 Texas Crim. Rep., 498, 113 S. W. Rep., 536.

On question of reasonable doubt: Ham v. State, 4 Texas Crim. App., 645; Bland v. State, 4 id., 15; Massey v. State, 1 id., 563; Zwicker v. State, 27 id., 539.

On the question of exceptions to the court's charge, and the refusal of special charges: Articles 737, 743, 744, Code Criminal Procedure; sections 839, 840, article 717, White's Criminal Procedure, and authorities therein cited.

*C. E. Lane,* Assistant Attorney-General; *Will P. Brady,* District Attorney, and *A. L. Camp,* for the State.—On question of self-defense: Thumm v. State, 7 S. W. Rep., 236; Fitzpatrick v. State, 38 S. W. Rep., 806.

On question of court's charge on wound of deceased: Hart v. State, 15 Texas Crim. App., 202; Williams v. State, 2 id., 271; Carlisle v. State, 38 S. W. Rep., 991; Strang v. State, 22 S. W. Rep., 680; Walker v. State, 42 Texas, 360.

On question of discretion of court: Cases cited in opinion.

HARPER, JUDGE.—In this case appellant was indicted, charged with the murder of Knox Crowe. When tried he was convicted of manslaughter, and his punishment assessed at two years in the penitentiary.

It appears from the evidence that W. C. Crowe, Miss Crowe and deceased went from their home to Saragosa, where appellant was managing a mercantile establishment. Upon arriving near the store, W. C. Crowe and deceased got out of the hack (leaving Miss Crowe in the hack) and went into the store where appellant was waiting on a customer. They informed appellant he must marry Miss Crowe and went with him from the store to the hack. Miss Crowe was told to get out of the hack, and W. C. Crowe, her father, who was a justice of the peace, performed, or began to perform, the marriage ceremony between appellant and his daughter. Appellant, seizing an opportunity, drew a pistol from his pocket and fired at W. C. Crowe, who fell, having been wounded in the head. He then shot deceased, emptying his pistol. He then ran back to the store, seized a Winchester rifle, loaded it, returned to the front part of the store, stepped off the gallery, and seeing deceased on the gallery of Mata's store, fired at him with the rifle. Deceased then went into Mata's store, about ninety-four feet from appellant's place of business, where he shortly thereafter died from the effects of a wound received during the difficulty. The facts will be more fully discussed in passing on the questions raised in the motion for a new trial and in the bills of exception.

In bill of exceptions No. 1 defendant complains that the court refused to permit him to prove by Dr. R. O. Braswell, of Ft. Worth, what the doctor told W. C. Crowe on the occasion of the latter's visit to Fort Worth. The bill shows that Dr. Braswell would have testified "he told W. C. Crowe that one T. E. Gibbons had sent money to Miss Crowe, and had been in Fort Worth and made arrangements for the care of Miss Crowe at the Rescue Home, and had agreed to pay $100 to have the child adopted, and that he (the doctor) thought Ed Gibbons was the father of the child. That he had seen Gibbons with his arms around Miss Crowe in one of his private offices." W. C. Crowe was not on trial; the defendant is not shown to have had any knowledge of this conversation prior to the shooting, and what the doctor may have told Mr. Crowe was not admissible. If Mr. Crowe was on trial it might have a tendency to show whether he was acting in good faith, but such conversation between the doctor and Mr. Crowe, a month before the difficulty, under the evidence in this case, could not and would not shed any light on the motives and actions of defendant on the day of the difficulty. He admits having had sexual intercourse with the daughter of W. C. Crowe, and, while he maintains it was impossible for him to have been the father of the child, yet his testimony would show he knew that W. C. Crowe was seeking to force him to marry the girl, because of a belief that he, appellant, was the father of the child, and that the doctor informed Mr. Crowe of his (the doctor's) belief, or circumstances that rendered it possible or probable that another person had also had sexual intercourse with his daughter, would not be admissible. Mr. Crowe, when on the witness stand, was asked if he had a conversation with Dr. Braswell, and admitted that he had a conversation. He was then asked if he did not tell Dr. Braswell he was going to kill appellant. He denied making such statement. Dr. Braswell was permitted to testify that Mr. Crowe did tell him in that conversation he was going to kill appellant. Mr. Crowe was asked nothing further in regard to the details of the conversation. Consequently he could not be impeached upon something he was not questioned in regard to, and it was not admissible for that purpose in the absence of Mr. Crowe being interrogated in regard thereto. Miss Crowe, or Mrs. Holmes, at the time the doctor was offered as a witness, had not been placed on the witness stand. Consequently his testimony was not admissible at that time to impeach any statement she made, and he was not offered as a witness after she had testified, but when she did testify, Mrs. Whitmore, Mrs. Murtishaw and Dolly McCorkle were permitted to testify what she had stated at this time, and if the doctor had been again offered as a witness, he would doubtless have been permitted to testify to all these matters that came within his knowledge and under his observation, and what the bill says it was expected to prove he told Mr. Crowe. Not that he told Mr. Crowe,

but the facts themselves, it being immaterial whether or not he told Mr. Crowe. As the matter is presented there was no error in not permitting him to state what he told Mr. Crowe.

In the second bill it is complained that the court erred in limiting the argument on the facts to the jury to four and a half hours to the side, giving as a reason for so doing that the term of court was drawing near to a close. By article 705 of the Code of Criminal Procedure, it is provided that the court in felony cases shall not limit the argument to less than two addresses to each side. In this case it is not contended that the court did so limit the argument; the only contention being that the time was insufficient to properly present the case. This is a matter within the discretion of the judge trying the case, and in the absence of a showing that such discretion had been abused, or that defendant suffered some injury thereby, such matters will not be reviewed. The bill does not even disclose that appellant's counsel used the time allotted to them. Huntly v. State, 34 S. W. Rep., 923; Scott v. State, 36 S. W. Rep., 276.

In bill No. 3 appellant complains that the court had the jury to retire, while counsel for the State and defendant presented authorities and made their argument to the court on questions of law applicable to the case. The jury are the judges of the credibility of the witnesses and the weight to be given to the testimony, but under our system of procedure they receive the law from the court and it is a matter within the discretion of the court whether or not the authorities shall be presented to the court in their presence, and this discretion will not be revised on appeal unless that discretion has been abused to the prejudice of the defendant. (Jacobs v. State, 37 Texas Crim. Rep., 428; Phipps v. State, 36 Texas Crim. Rep., 216; Burt v. State, 38 Texas Crim. Rep., 397.) In the bill it is not shown wherein appellant suffered any injury from such action on the part of the court.

In the motion for a new trial, from paragraph nine to paragraph twenty-three, it is urged: "The court erred in his failure and refusal to give to the jury defendant's requested special charge No. 1," in each paragraph naming a different number of special charge requested. In bills of exception from No. 4 to No. 19, inclusive, it is also complained that the court erred in failing to give these special charges. The bills read: "Be it remembered that upon the trial of the above entitled and numbered cause the defendant, by his counsel, before the regular charge was read to the jury, requested the court to give in charge to the jury the following special charge: (Here is copied one of the charges.) And be it further remembered that after the court had duly considered said charge the court refused to give the same to which action of the court the defendant then and there in open court excepted, and here now tenders his bill of exceptions, and asks that same be filed, approved

and made a part of the record herein, which is accordingly done." It will be seen that neither in the bills of exception, nor in the motion for a new trial, a reason is assigned why the court erred in failing to give such charge, nor reasons given why the charge should have been given. This question has been recently before this court in the case of Ryan v. The State, 64 Texas Crim. Rep., 628, and Berg v. State, 64 Texas Crim. Rep., 612 (not yet reported), and while the writer, in the Ryan case, expressed his individual opinion, yet the court decided that the rule announced by Judge Davidson in the case of Quintana v. State, 29 Texas Crim. App., 401, was the correct rule and should be adhered to. In that case it is said:

"There is a bill of exceptions reserved to the charge as an entirety, in which the only objection urged is thus stated: 'Because the same did not instruct the jury fully upon the law governing in this case under the facts proved.' The court's qualification of this bill of exceptions is thus stated: 'When the charge was read to the jury, the defendant's attorney excepted to the charge without assigning any reason.' We are not called upon to consider this exception. 'Bills of exception when too indefinite to point out distinctly the matter complained of as error will not bring such matter properly before the court for review.' Smith v. The State, 22 Texas Court Appeals, 316; Williams v. The State, id., 497. The primary object or purpose of a bill of exceptions reserved to a charge of the court is to call the attention of the trial judge to the particular matter complained of, so that he may be afforded an opportunity to correct any error he may have fallen into, to the end that the rights of the defendant may not be prejudiced. A general exception does not accomplish this. Another reason why the bill of exceptions should point out specifically the errors complained of, is to enable this court to ascertain what error was committed without having to examine other portions of the record. This is not done by a general exception. The bill must be so certain and full in its statements that the errors complained of are made to appear by the allegations of the bill itself. Willson's Crim. Stats., sec. 2368. Tested by these rules, the bill is insufficient to bring before this court any supposed errors in the charge which are calculated to injure the rights of the defendant. Smith v. The State, 22 Texas Ct. App., 316; Mace v. The State, 9 Texas Ct. App., 110; Smith v. The State, 15 Texas Ct. App., 139; Lewis v. The State, 18 Texas Ct. App., 401." This same rule has been applied to errors assigned in the motion for a new trial, that is, some reason must be given why the court erred in the particular complained of and a ground "that the court erred in failing to give special charge No. 1" or any other number is too general to be considered and does not point out the error in such manner that this court can, or will consider same. Shelton v. The State, 54 Texas Crim. Rep., 588; Mitchell v. The State, 55 Texas Crim. Rep., 62; Mercer v. The State, 52 Texas

Crim. Rep., 321, 106 S. W. Rep., 365; Duncan v. The State, 55 Texas Crim. Rep., 168, 115 S. W. Rep., 837; Holmes v. The State, 55 Texas Crim. Rep., 331, 116 S. W. Rep., 571; Harris v. The State, 93 S. W. Rep., 726; Glascow v. The State, 50 Texas Crim. Rep., 635, 100 S. W. Rep., 933; Woodrich v. The State, 90 S. W. Rep., 882; Webb v. The State, 70 S. W. Rep., 954; Cubine v. The State, 45 Texas Crim. Rep., 108, 74 S. W. Rep., 39. The rule adopted by this court appears to be that the motion for a new trial must so definitely specify the reasons therefor as to direct attention to the precise error of which complaint is made, and no reason not so specified can be urged on appeal in this court; and inasmuch as the appellant neither in the motion for a new trial, nor in the bills of exception assigned any reason why the court erred in failing to give the special instructions, or either of them, we can not review this matter. Attorneys some time proceed as in civil cases. In their motion for a new trial they merely state the court erred in the following paragraph of his charge, setting out the paragraph, or the court erred in failing to give the following charge, and then in assignments of error filed later on, point out the error claimed, by stating propositions under the ground placed in the motion for a new trial. This is not the rule in this court, but the proposition, reason and all must be stated in the motion for a new trial, for it is not permissible in this court to subsequently file assignments of error. This is no new rule, but one adopted by this court many years ago. In the case of Jones v. The State, 55 Texas Crim. Rep., 207, this court says: "Attached to this record is a long assignment of errors. We can not pass upon assignments of error in this court at all; but all complaints must be embodied in motion for a new trial or in bills of exception. And we again, as we have frequently done, warn clerks against placing assignments of error in records, thereby encumbering same and adding to the expense of trials in this State. Article 723 of the Code of Criminal Procedure expressly limits the jurisdiction of this court on the question of review of errors or supposed errors to grounds set up in motion for new trial or bill of exceptions." See also Jones v. The State, 57 Texas Crim. Rep., 144; Sue v. The State, 52 Texas Crim. Rep., 122; Ford v. The State, 41 Texas Crim. Rep., 1; Stewart v. The State, 50 S. W. Rep., 459.

In another bill defendant complains of the action of the court in admitting certain testimony. It appears that while defendant's witness, Wren, was on the stand, he was asked on cross-examination if he had not formerly lived in Wood County and had not been frequently indicted there for a number of offenses, and he answered that he had lived in Wood County and he had been indicted two or three times, but could not say how many times. That he had not been indicted as many as six or seven times. This testimony was admitted without objection from anyone. In rebuttal

the State introduced N. J. Britton, the county attorney of Wood County, as a witness, and he testified, without objection, that Wren had been indicted in that county nine or ten times. He was then asked for what offenses he was indicted when the defendant objected on the ground that the indictment would be the best evidence. The State then asked if he had the indictments with him, which question he answered, without objection, that he had the indictments with him. The State then offered the nine indictments in evidence, to which defendant objected on the ground "that said indictments were for misdemeanors, and imported no moral turpitude, and were not the proper way to impeach a witness." The court overruled the objection and admitted the indictments in evidence. An inspection of the indictments show that they charged the defendant with violating the local option law and with gaming. The court erred in admitting the indictments in evidence. (Pollok v. The State, 101 S. W. Rep., 231, and authorities there cited.) This witness was material in one respect, in testifying that defendant went with Mr. Crowe and deceased from the store to the hack, where the marriage ceremony is said to have been performed, under duress, and if the fact of whether or not appellant was under duress at this time was an issue to be determined by the jury, this might probably present grounds for complaint, even though the fact that defendant had been indicted by the grand jury a number of times was admitted in evidence without objection. But the court instructed the jury in effect that defendant was under duress at that time and they must not consider his acts nor the shots he fired in freeing himself from such duress. The evidence (from the defendant's standpoint) would have deceased and his father come to the store of appellant and by the use of firearms compel him to accompany them to the hack where deceased's sister was holding the horses, and when they arrived at that point to compel him to, partially at least, enter into marital vows with this sister. While the ceremony was being pronounced, appellant says, Mr. Crowe undertook to turn the leaves of a book, and while he was doing this he, appellant, jerked his pistol, of small calibre, and fired three times at Mr. Crowe, who fell; that he then turned and fired three times at deceased. The evidence shows conclusively that neither of these shots were fatal, but the fatal shot was a shot from a gun of a larger bore, either a Winchester rifle or a large bore pistol, which struck deceased in the right side. Appellant, by the testimony of his witnesses, sought to prove that Mr. Crowe was the person who inflicted this wound on deceased with a 45-calibre pistol, one witness testifying that he had heard Mr. Crowe say he came near shooting deceased by mistake. The testimony of all the witnesses, appellant included, shows that when he fired these six shots he ran to the back door of his store, a distance of about two hundred feet, as shown by the map in the record. When he got in the store he

grabbed a 30-30-Winchester rifle, and, he says, deceased came to the door of his store, when he told him not to come in there, and deceased did not do so. That he then loaded the Winchester rifle, and went out the front door and saw deceased on the gallery of Mata's store, a distance of ninety-four feet from his store. That deceased turned his head as if to look at him, when he fired at him with the Winchester rifle, but does not think he struck him, when deceased went into Mata's store. Deceased shortly died from the effects of a wound in his right side. The court instructed the jury, it being the second paragraph of the charge: "It is established by all the evidence in this case that the death of deceased, Knox Crowe, was caused by the wound in his right side or breast, and you will consider this and no other wound as the cause of death of deceased."

The court further instructed the jury: "If you find from the evidence that someone else other than defendant fired the shot that inflicted the wound in the right breast or right side of the deceased, then you will find the defendant not guilty.

"If there is, from the evidence, reasonable doubt in your mind as to whether the defendant fired the shot that inflicted the wound in the right side or right breast of the deceased, or whether the shot that inflicted said wound was fired by some other person than the defendant, you will resolve the doubt in favor of the defendant and find him not guilty."

"The defendant is presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt, and if you have a reasonable doubt as to the defendant's guilt you will acquit him and say by your verdict not guilty."

It is thus seen that the court in his charge eliminated from the consideration of the jury all the acts of defendant and shots fired by him to effect his release from duress or improper restraint. Deceased was shown to have three wounds in his body, two of which were made with a weapon of small calibre—one in the left breast and the other in the right buttocks. The other wound was in the right side or right breast, and was made with a weapon of large calibre. The doctor who made the examination made a diagram showing the wound at place of entrance, it being a little over twice as large as the other two wounds. Taking into consideration the testimony, the charge of the court instructs the jury they could not convict defendant for the wounds made by him with the small calibre weapon in freeing himself from restraint; consequently the testimony of the witness Wren that would tend to show defendant under restraint before the firing of any shots, was not material under the charge of the court, for the court's charge, in effect, instructs the jury that he was under restraint, and could not be convicted for any acts committed in freeing himself from such restraint and the error in admitting the indictments in evidence is not of

that nature that should work a reversal of the case, the witness' evidence being upon an immaterial matter in view of the fact that the court thus submitted the case to the jury. As to the last shot, the witness would be material for the State, for he says he did not see the first shots by defendant, but heard the shooting, saw the defendant run in his store, and saw deceased run to Mata's store, climb on the gallery and was on Mata's store gallery when defendant fired the last shot, contradicting appellant when he says deceased came to his store. Fitzpatrick v. State, 38 S. W. Rep., 806.

Defendant however, complains of that paragraph of the court's charge wherein he instructed the jury that the death of deceased was caused by the wound in the right side or right breast, saying that it was upon the weight of the testimony; that it took away from the jury the right to say which wound caused the death, claiming that there was evidence upon which the jury could have found that other wounds caused the death of deceased. This is a voluminous record, but we have carefully examined and reexamined the testimony, and the testimony of Dr. Lusk, for the State, and Dr. Wolverton, for the defendant, and other witnesses, both for the State and defendant, fix, beyond all question, and unequivocally, that the wound in the right side or breast was the immediate cause of death. There is some evidence that if he had not received this wound, that the wound in the left breast might have proven fatal in the course of time from infection, but it would take from two to six days for infection to take place, if at all, and if infection did not set up, it would not be a fatal wound. Deceased died in an hour or hour and a half from the time of the difficulty, and all the witnesses agree that the large wound in the right breast or side was the wound, and the only wound, that could have caused death in that time, consequently in taking away from the jury consideration of the wounds in the left breast and buttocks could not have been injurious to defendant, but was beneficial to him, for there was no question under the testimony that he fired the shots that made these two wounds, and the court in submitting the case solely on the wound in the right breast, and then submitting to the jury the question of whether defendant inflicted this wound, was presenting the case as favorably to defendant as the evidence justified. It has been held in a number of cases in this State, where facts are admitted to be true, or are placed beyond any doubt without contest, the court in his charge may so assume without infringing the rule inhibiting a charge upon the weight of evidence. Nelson v. The State, 35 Texas Crim. Rep., 205; Holliday v. The State, 35 Texas Crim. Rep., 133; Pearce v. The State, 35 Texas Crim. Rep., 150; Davis v. The State, 6 Texas Crim. App., 133; Tracy v. The State, 44 Texas, 9; Elizando v. The State, 31 Texas Crim. Rep., 237; Carlisle v. The State, 37 Texas Crim. Rep., 108; Strang v. State, 32 S. W., 219; Byrd v. The State, 53 Texas Crim. Rep., 507.

In this case under the evidence there was no question that the wound in the right side or breast caused the death of deceased, and there was no error in the court so assuming in his charge; the question of whether the defendant inflicted this wound was properly submitted to the jury, and no fact was assumed which could or would injuriously affect defendant.

Defendant also objected to that paragraph of the court's charge, copied above, wherein he instructed the jury that "if you find from the evidence that someone else than the defendant fired," etc., they would acquit, it being alleged that said paragraph required the jury to believe that someone else fired the shot and did not give to the defendant the benefit of a reasonable doubt as to him being the person who fired the shot. If we take this paragraph alone, it might lend some color to such contention, but when we take the charge as a whole, it is not subject to this criticism. Hereinabove we have copied not only this paragraph, but two other paragraphs which shows that the court requires the jury to find beyond a reasonable doubt that defendant fired the shot that killed deceased, or they would acquit, and then applied the doctrine of reasonable doubt to the case as a whole.

The court further instructed the jury: "A reasonable doubt is an actual doubt that you are conscious of, after going over in your minds the entire case, giving consideration to all the testimony, and every part of it. If you then feel uncertain and not fully convinced that the defendant is guilty, and believe that you are acting in a reasonable manner, and if you believe that a reasonable man in any matter of like importance would hesitate to act because of such a doubt as you are conscious of having, that is a reasonable doubt of which the defendant is entitled to have the benefit." While perhaps the court was not required to define "reasonable doubt," in the absence of a request so to do, yet doing so in the language above, could not have been hurtful to defendant. This charge is a verbatim copy of a definition of reasonable doubt in the case of Holt v. United States, 31 Sup. Ct. Rep., 2, and informs the jury that defendant is entitled to have the benefit of such doubt and in effect tells them if they are uncertain and are not fully convinced of the guilt of defendant, they will acquit him.

There is no bill of exceptions in the record showing that the court gave his "regular and customary lecture to the jury," or if he did what he said at the time, and the record being in this condition, we can not consider this ground in the motion for a new trial.

In the third and fourth paragraphs of the motion for a new trial defendant complains of certain isolated sentences of the charge on manslaughter, but this part of the charge, when taken as a whole, is not subject to the criticisms. In this case the jury found the defendant guilty of manslaughter and assessed his punishment at only two years in the penitentiary and the charge of the court on

this subject is a full and complete presentation of the law as applicable to the evidence in this case.

This disposes of all the bills of exception and grounds in the motion for a new trial, except bill No. 23, in which is raised the question that the evidence called for and required a charge on self-defense. If the court had not eliminated from the consideration of the jury the first six shots at the back, fired by defendant, it would have been necessary and proper for the court to have instructed the jury that appellant had the right to use all necessary force and means to free himself from illegal restraint, but the court by his charge in taking from the consideration, this difficulty, or part of the difficulty, and instructing them that if they, from the evidence, did not believe beyond a reasonable doubt that defendant fired the shot which inflicted the wound in the right side or breast of deceased, they would acquit, in effect justifies the defendant in his course in freeing himself from duress. After defendant had fired these six shots, he goes into his store, secures a Winchester rifle, loads it, and voluntarily returns to a place where he knows he will likely meet deceased and his father. To put the matter in the strongest light for defendant, he says that after he fired the first six shots he broke and run to the back of the store, around the store, and into the store, "grabbed a gun in the store, a new 30-30 that belonged to the stock. As I grabbed the gun, I saw deceased start in the front door. I threw it down on him and told him to go back, and he did so. I ran up to the counter and threw some cartridges in this gun and ran to the front of the store. I thought they might be out the back way, and when I got to the front door I looked over on this side where the trouble came up, and I didn't see anybody, and as I swung around I saw this boy close to the other store, and as he threw around I shot, and jumped in the store." Thus it is seen that when deceased went away from his view, and knowing, if his testimony is true, that deceased had just been at his front door, he loads the rifle and goes to this door, when he sees deceased some ninety-four feet away near another store and fires a Winchester rifle, shooting at deceased. Self-defense is a defensive, not an offensive, act, and if one be in danger, yet gets beyond that danger, arms himself and returns to a place where he knows he must meet his adversary, is he not, by so doing, courting a renewal of hostilities, and if he does do so, can he then claim to be acting in self-defense? A case might be presented where a person, even under those circumstances would have the right to act in defense of some overt act, but that is not this case, according to defendant's own testimony. Defendant only says that deceased "swung around" without making any demonstration whatever, according to his testimony, when he shot. The State's evidence would make a case that when he emptied his pistol, he returned to his store, secured a rifle, loaded it, and came back to the door and

immediately fired on deceased, at a time when deceased was trying to get away, and go into another store. That deceased did not go to the gallery of defendant's store, and State witness Eckleberry says he went to the store of appellant and found appellant with a Winchester, and he asked him not to go out there, but appellant went anyway. Several questions in this case, and especially the question raised in this assignment, are discussed by Judge Davidson in Fitzpatrick v. State, 38 S. W. Rep., 806-811. While deceased had a pistol on his person, not a shot was fired by him, and it was found in his holster after his death. If this shot from the Winchester is the shot that killed deceased, we do not think the evidence raises the issue that at this time defendant was acting in self-defense, and the court instructed the jury that if this is not the shot that killed deceased, they would acquit defendant, and also presents the issue as to whether defendant or some other person inflicted this wound. If defendant inflicted the wound submitted to the jury, it was done with the rifle. If defendant had killed deceased at the time he was freeing himself from restraint, a different question would be presented, but under the evidence he had shot down the senior Crowe, and shot deceased with a small calibre pistol in effecting his release or escape. He had then gone back into his store, and if he had armed himself and remained there, and the deceased had sought to attack him, or it appeared to defendant he was about to attack him, he could claim to be acting in self-defense. But after arming himself with a rifle and loading it, he does not remain in his store, nor wait to see if he will be attacked, but voluntarily goes back out on the streets, where he must know that his appearance may provoke a renewal of hostilities, and as soon as he sees deceased he fires on him.

The court tells the jury that if defendant had been illegally restrained of his liberty, and this produced anger, rage or resentment to such an extent as to render his mind incapable of cool reflection, if he shot and killed deceased, he would be guilty of no higher grade of offense than manslaughter, and of this offense the jury finds defendant guilty, and as we read this record, if the shot that killed deceased was the shot fired by defendant with a rifle after he had gone in the house and voluntarily returned to near the scene of the conflict, the verdict is supported by the evidence.

Finding no reversible error in the record, the judgment is affirmed.

*Affirmed.*

DAVIDSON, Presiding Judge, dissents.

### ON REHEARING.

#### October 30, 1912.

HARPER, JUDGE.—Appellant has filed a motion for rehearing in this case, and we have given it mature and deliberate consideration. After consultation with the other members of the court, it

may be that we erred in holding that there was no error in the trial court refusing to submit the issue of self-defense. Appellant earnestly insists that this is not a case where appellant had gotten to a place of safety and voluntarily returned to where he knew there would of necessity ensue a renewal of the conflict. It is upon this issue the question must be decided and perhaps we erred in concluding that, from appellant's standpoint at the time, he had gotten to a place of safety. He testifies there were two doors to the store; that deceased appeared at one door and he ordered him away; that there were two assailants, and he was expecting an attack from the other also. Situated as the doors were, he could not watch both at one time, and he claims it was for this reason that he went out of the store again after arming himself, and then he testifies: "I do not suppose it had been over a half minute from the time I did the shooting out there until I fired the shot with the rifle; as quick as I could run around there. I ran as hard as I could. I just jumped out and shot and jumped right in. *I shot that shot because I thought the boy was fixing to shoot me.*" (Statement of facts, p. 203.) Again, on page 236, he says: "I did not go out on that porch with the sole purpose of finishing up the work. I shot because I thought he was going to shoot me. He looked to me like he was fixing to shoot me and I shot him. I most assuredly do tell the jury that the reason I shot the last shot at him was because I thought my life was in danger. When I stepped out on that front porch I looked out over where I left them, and as I whirled I saw him looking like he was going to shoot me and I shot him to save my life. He had his gun in his hand. I saw the gun and saw him. *I was looking for him to kill me every minute. I did not stay in the store because I was afraid one would come in the back door and one in the front door.*"

Under the evidence as a whole, at the time of trial, appellant's right to return to the scene of conflict after arming himself again, is not very strongly presented, but taking into consideration that these matters must be viewed as they appeared to him at the time, perhaps a properly worded charge presenting the issue of self-defense, if the jury had a reasonable doubt he had reached a place of safety after the first shots had been fired, viewing the matter as it appeared to him at the time, should have been given. When a person is justified in firing the first shots, as appellant was entitled in this case, it must be apparent that the danger is passed, or he has reached a place where it is not reasonable for him to have fear of life or serious bodily injury at the time before his right of self-defense would be abridged. We have concluded, after a more careful and painstaking consideration of the record, that under his evidence appellant had the right to have this issue submitted to the jury, and the court erred in not doing so. The court perhaps was **not** authorized to find as a fact that appellant had reached a place

of safety but this issue should have been left to the jury to decide under appropriate charges.

As to the charge on a reasonable doubt, we still do not think it would present ground for reversal of the case, but as the case will be reversed we will say it is better for the court to give this charge in the language of the statute and not undertake to define the meaning of the words, for if the language used limits or takes away from a defendant the reasonable doubt that our law· says he is entitled to in every case, it would be reversible error. It may be that this right should be abridged, in the opinion of some people, but this is a right the law gives to each defendant, and so long as it is the law it should not be limited nor abridged, and this court can not sanction it being done.

While it is true, as appellant says, and as we held in the original opinion, it was error for the court to permit the indictments against Wrenn to be introduced in evidence, yet in this case it would not present reversible error for the reasons stated. However, on another trial, the court will not permit these indictments to be introduced, as they were for misdemeanors not involving moral turpitude. This court has gone far, and much further than many of the courts, in permitting impeachment of witnesses by this character of testimony, and the great weight of authority is against a further enlargement of this right, and this court must decline to go further than it has gone. The offense for which one is indicted or convicted must be of the grade of felony, or involve moral turpitude, or this character of testimony will not be permitted to be introduced.

The other grounds in the motion we do not deem it necessary to review, but on account of the above matters the rehearing is granted, the former judgment is set aside, and the judgment of the court below is reversed and the cause is remanded.

*Reversed and remanded.*

DAVIDSON, PRESIDING JUDGE (*concurring*).—During the last term of this court the judgment in this case was affirmed, opinion by Judge Harper concurred in by Judge Prendergast. At the time of the rendition of the opinion, I simply entered my dissent with a view of writing out my views later. Appellant filed a motion for rehearing in the meantime. Upon the hearing of this motion the rehearing was granted and the judgment reversed and the cause remanded. I concur in the reversal and am of the opinion that there are other questions in the case of importance and of such erroneous nature as should also have been mentioned in the opinion of reversal. This homicide occurred on account of the illicit amours with the sister of the deceased. The contention of the State is that appellant had had carnal intercourse with the girl and was the father of her child. The contention of appellant was that Gibbons had been having intercourse with deceased's sister for quite awhile and

was the father of the child and that he, appellant, was not the father of the child. There is considerable testimony in the record in regard to this matter which I do not care to state, but will give a substantial statement in regard to that issue: The witness Crowe, father of the girl, testified that his daughter told him that appellant was the father of the child and that he and his son, deceased, went with his daughter to where appellant was for the purpose of making him marry her and give the child a legitimate name. The language was that he went to the defendant and said: "I want to give my daughter and her child a name." This witness further stated that his daughter had been in Fort Worth a part of the time and in Dallas part of the time, and he first learned of her pregnant condition about the 22d of September, and learned it from Dr. Braswell in Fort Worth; that he immediately got on the train and went there. He said Dr. Braswell informed him where she was and he went to see her. That during the conversation with her she said appellant was the father of her child; that he intended to bring her home, but she was in family way and he left her until after her confinement; that after her confinement she came home along about the 3d or 4th of November. Appellant denied most emphatically being the father of the child, and the issue along this line was thus formed.

The first bill of exceptions found in the record recites that while W. C. Crowe was testifying for the State, he was permitted, over appellant's objection, to state that his daughter, Dossie Crowe, told him that P. K. Holmes was the father of her child; and was permitted further to testify that from the conversation which Crowe claimed to have had with his daughter at the Rescue Home in Fort Worth, in connection with the conversation he had with Dr. Braswell in Fort Worth at the same time, he arrived at the conclusion that P. K. Holmes was the father of his daughter's child. The defendant then offered Dr. Braswell, who would have testified that in his office at Fort Worth he told W. C. Crowe that T. E. Gibbons had sent money to Miss Crowe, and that Gibbons had been in Fort Worth and made arrangements for the care of Miss Crowe at the Rescue Home and agreed to pay $100 to have the child adopted, and that thereupon said W. C. Crowe asked him what his opinion was as to who was the father of the child, and witness replied, "from the facts in hand, he would certainly think that Ed Gibbons was" (meaning T. E. Gibbons). The bill further states that Dr. Braswell would have testified that on the day before Miss Crowe went to the Rescue Home he had found her and T. E. Gibbons standing up, and Gibbons had his arms around her, in one of his private rooms in his office. And further recites that said witness would have testified that he sent telegrams to said Gibbons, urging him to send money for Dossie Crowe, and had received from said Gibbons the following letter:

"Toyah, Texas, Aug. 12-1910.

"Dr. R. O. Braswell,

"Ft. Worth, Texas.

"Dear Sir: In compliance with my wire of this date I herewith enclose $25 which please hand to the party. I have heard a great deal of you and must trust a great deal to you. Do not write me if you can possibly help it. I will be down to see you next week and acquaint you with the circumstances, and make further arrangements. Please burn this letter.. I beg to remain,

Yours truly,

T. E. Gibbons."

This was offered for the purpose of showing defendant was not responsible for the condition of Dossie Crowe, and to impeach the said statement of Dossie Crowe that the appellant was the father of her child and that he was the only person who had had intercourse with her; and to corroborate the defendant Holmes in his testimony that Dossie Crowe had told him that Ed Gibbons was the father of her child and that she had had intercourse with said Gibbons on divers occasions. The testimony offered by the defendant to meet that of the State was ruled out on the objection of the State that it was irrelevant and immaterial and "not shown to have been communicated, the facts or fact, to the defendant, prior to the time of this tragedy, and the only bearing, if any it could have on it, would be the state of mind, if at all, of W. C. Crowe, which would be immaterial to any issue in this case." My brethren, in the original opinion, hold that this bill of exceptions does not show error. With this conclusion I can not agree. After having permitted Crowe to testify as to his visit to Dr. Braswell and his conversation, conclusions, etc., defendant was authorized to meet those matters as best he could. While it may be true that the testimony of Crowe was inadmissible, yet the court permitted it to go to the jury and, having gone to the jury, then appellant had the right to meet those matters with the best available testimony, even if it had no higher dignity as evidence than that introduced by the State. It is a settled rule and one that is correct, fair and just, that wherever one party introduces a fact or circumstance against the other, the one against whom it has been introduced has the right to meet it as best he may, and he can meet this with testimony of the same character and nature. If that introduced by one party is hearsay and it goes to the jury, the other party can meet it with the same character of evidence. It was made a material question in the case as to whether Gibbons had had intercourse with Miss Crowe in the first place, and in the second place, that he was the father of her child. The State was claiming that Gibbons had not had intercourse with her—introduced evidence to that effect—and that appel-

lant had and was the father of her child. An inspection of this entire bill, as above shown, demonstrates, in my judgment, that appellant was entitled to introduce the testimony offered by him under all the decisions in this State. The authorities are quite numerous. In Skidmore's case, 57 Texas Crim. Rep., 497, it was said, where upon trial for incest, the State had been permitted to introduce testimony that the woman with whom the incest was alleged to have been committed had a child within nine months after she stated defendant had carnal intercourse with her the previous December, defendant had the legal right to introduce testimony to show that he was not the father of the child, and that other parties had carnal intercourse with prosecutrix about that time.

In Bader's case, 57 Texas Crim. Rep., 293, Judge Ramsey, writing the opinion of the court, said, where the testimony of the prosecutrix, who was under the age of consent, was that she had not had intercourse with any other person than defendant, and there was testimony from physicians as to her physical condition, it was reversible error not to have permitted the defense to introduce testimony tending to show that prosecutrix was guilty of acts of intercourse with other persons than defendant, both to show her physical condition and for purposes of impeachment. The Bader case followed Bice v. State, 37 Texas Crim. Rep., 38. The Bice case was approved in Knowles v. State, 44 Texas Crim. Rep., 322. For a collation of numerous authorities, see Branch's Criminal Laws of Texas, sec. 707. Upon another trial if this issue is in the case, in my judgment, the testimony offered by appellant should be introduced. In other words, if the State should undertake to show that appellant was the only man who had intercourse with Miss Crowe, then he could unquestionably show that other parties had, and should the State undertake to show that he was the father of the child, then he could meet that with the testimony that he was not the father of the child. The authorities cited fully sustain this proposition. Even if an authority were not extant the rule is a just one, a fair one and correct.

There is one other question that I desire to notice just briefly. My brethren, in the original opinion, set out the charge of the trial court on reasonable doubt and the presumption of innocence. An inspection of that charge, which is correctly copied in the opinion from the trial court's charge, shows it to be a charge on the weight of the evidence and is rather a dissertation on the two questions. This has been condemned by all the decisions of this court in this State in the history of our jurisprudence. My brethren suggest that upon another trial it will be well enough to conform to previous decisions but intimate that they would not reverse the judgment for this reason alone. This character of charge, in this State, has always been held reversible and in direct contravention of the statute, which expressly prohibits the court from charging on the weight of the evidence. For a collation of the authorities, see Branch's Criminal

Laws of Texas, sec. 718. It is there stated that a charge on reasonable doubt should be. given in the language of the statute. Attemps to amplify it, or explain it, or belittle it, almost invariably lead to a reversal. Bray v. State, 41 Texas, 560; Schultz v. State, 20 Texas Crim. App., 315; Bramlette v. State, 21 Texas Crim. App., 611; Holmes v. State, 9 Texas Crim. App., 313; Cleavinger v. State, 43 Texas Crim. Rep., 273; Smith v. State, 9 Texas Crim. App., 150; Robertson v. State, 9 Texas Crim. App., 209; Johnson v. State, 27 Texas Crim. App., 163; Wallace v. State, 9 Texas Crim. App., 299; Fury v. State, 8 Texas Crim. App., 471; Cohea v. State, 9 Texas Crim. App., 173; McPhail v. State, 9 Texas Crim. App., 165; King v. State, 57 Texas Crim. Rep., 363. For other authorities see section of Branch's Crim. Law, above cited. In concurring with the reversal, I desire to make the above remarks.

I concur in the reversal.