### J. A. SERRATO V. THE STATE.

No. 2990. Decided May 6, 1914.

Rehearing denied June 10, 1914.

**1.—Murder—Indictment—Change of Venue—Quorum of Grand Jury—Amendment.**

Where the language in the minutes of the court from which the venue was changed recited "That the Honorable Grand Jury appeared in open court and presented the indictment," it was a literal compliance with the statute, and a motion that the entry did not show that a quorum of the grand jury was present not having been made in limine, but in the District Court to where the venue was changed, so no amendment could be made, and it not being a

question which went to the substance of the indictment, a motion to quash the indictment was properly overruled; in the absence of a sworn plea alleging that a quorum of the grand jury was not present when the indictment was found and presented in court. Following Caldwell v. State, 41 Texas, 86.

### 2.—Same—Rule Stated—Irregularities—Entry—Indictment.

Irregularities in the record entry of the presentment of an indictment do not constitute cause for setting aside the indictment or in arrest of judgment. Such matters should be mooted by suggestion in limine to the court wherein the indictment was presented, and are not available in a different forum to which the venue has been changed. Following Hamilton v. State, 65 Texas Crim. Rep., 508.

### 3.—Same—Special Venire—Brief.

Where the special venire was drawn, served and returned in accordance with the provisions of the law, a complaint presented in appellant's brief that the court below should have quashed the special venire was properly overruled.

### 4.—Same—Evidence—Conspiracy—Declarations of Third Parties.

Where defendant and others were charged with the murder of deceased, and the State's evidence showed that defendant and his co-defendants had organized a company and armed themselves to invade the Republic of Mexico, and had selected a point in the county of the prosecution to gather and rendezvous, defendant knowing its object, intent and purpose, which among others was to kill any sheriff's posse or citizens that interfered, and that such agreement was not at an end when the parties were arrested, and the killing of deceased was but an incident to said agreement or conspiracy, all the facts and circumstances attendant upon the agreement or conspiracy, such as the acts and declarations of the co-conspirators and the efforts to accomplish them, including those which occurred after the death of the deceased, but before the arrest of the party, were admissible in evidence. Following O'Neal v. State, 14 Texas Crim. App., 582, and other cases.

### 5.—Same—Evidence—Unlawful Design—Inscription on Flag.

Upon trial of murder, where it was necessary for the State to show that the defendant and his co-defendants had gathered together in the county of the prosecution and were engaged in the unlawful design to invade the Republic of Mexico with an armed force, and were acting in violation as well of a State law as that of the United States, when the deceased was incidentally killed by them, there was no error in admitting in evidence the flag borne by the parties, which had the inscription upon it "The Liberal Party, Mexico. Land and Liberty."

### 6.—Same—Evidence—Warrant of Arrest.

Where, upon trial of murder, the evidence showed that the defendant and his co-defendant had armed and organized themselves to invade the Republic of Mexico, etc., and that the sheriff and his deputies proceeded to investigate their actions, and when approaching their camp were driven away and two of his posse were captured, including deceased, who was shortly thereafter killed by them, and the sheriff again followed them with a posse and captured them, a complaint that the officers were in the wrong because they had no warrant of arrest at the time of making said investigation is untenable.

### 7.—Same—Evidence—Declarations by Defendant.

Where, upon trial of murder, the evidence showed that defendant and his co-defendants acted together in an attempt to make an armed invasion into the Republic of Mexico and incidentally killed deceased in said attempt, which offense was included in the scope of their unlawful design, and defendant escaped when the majority of his companions were captured by the officers of the law, but was detected by a citizen to whom he made certain declarations and afterwards arrested, there was no error in admitting said declarations in evidence. Following Williams v. State, 53 Texas Crim. Rep., 2, and other cases.

**8.—Same—Evidence—Defendant as a Witness—Cross-examination.**

Where, upon trial of murder, the evidence showed that defendant and his co-defendants were captured by the officers in attempting to make an armed invasion into the Republic of Mexico during which they killed the deceased, and defendant took the witness stand in his own behalf and testified to every material fact in his defense, admitting that he was with the party, but denying that he participated in the killing, there was no error in permitting the State to cross-examine him upon all the salient facts; besides, it was shown by other testimony that defendant did actually participate with his co-defendants in the unlawful acts.

**9.—Same—Charge of Court—Circumstantial Evidence—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence showed that the defendant and others attempted an armed invasion into the Republic of Mexico, during which the deceased was killed by them and which offense naturally flowed from their common design to resist the officers and citizens who might interfere, and the court submitted a correct charge on circumstantial evidence, and the evidence was sufficient to support the conviction under a proper charge of the court upon all the issues raised by the evidence, there was no reversible error. Davidson, Judge, dissenting.

**10.—Same—Evidence—Other Crimes—Res Gestae.**

Upon trial of murder, where the evidence showed that the defendant and others made an armed attempt to invade the Republic of Mexico, during which they killed the deceased, which act naturally flowed from their unlawful design, there was no error in compelling defendant on cross-examination to testify in regard to the organization and purposes of the parties, which showed a conspiracy to violate the neutrality laws of the United States and the laws of the State of Texas, as this testimony threw light on the offense for which defendant was being tried. Following Gilbraith v. State, 41 Texas, 567, and other cases.

**11.—Same—Conspiracy—Charge of Court—Issue Involved.**

Where the defendant and others were charged with murder, and the evidence showed that defendant and his co-defendants entered into an agreement for an armed invasion into the Republic of Mexico and to resist all efforts to prevent the execution of their agreed purpose, and that in furtherance of said design and as a contemplated incident thereto they killed the deceased, the killing of deceased, and not the specific conspiracy to kill him, was the issue in the case, and there was no error in the court's failure to charge on the law of conspiracy.

**12.—Same—Requested Charge—Carrying Arms.**

Where, upon trial of murder, the evidence showed that the defendant and others entered into an unlawful conspiracy or agreement to make an armed invasion into the Republic of Mexico, there was no error in the court's refusal of a special instruction charging the jury not to consider any testimony concerning the carrying of arms, etc., into a foreign country, as the acts of the parties were a violation of the State law as well as the United States.

**13.—Same—Principals—Charge of Court—Declarations of Third Parties.**

Where, upon trial of murder, the court admitted testimony tending to show the purpose of the conspiracy formed by defendant and others in their attempt to make an armed invasion into the Republic of Mexico, which included the acts and declarations of others than the defendant after the killing of the deceased, which was incident to the act of the conspiracy, there was no error in the court's refusal of special instructions that the jury could not consider said acts and declarations of others, as this testimony was admissible to show whether defendant was a principal in the killing; the court submitting a charge upon circumstantial evidence and the law applicable to principals.

### 14.—Same—Conspiracy—Charge of Court.

Where the defendant and others were charged with murder, and not with the crime of conspiracy, and evidence of a conspiracy was introduced as tending to show that defendant was guilty as a principal in killing the deceased, though he himself did not fire the fatal shot, there was no necessity for the court to define the crime of conspiracy, the jury being sufficiently instructed on the law of principals and on circumstantial evidence.

### 15.—Same—Converse of the Proposition—Affirmative Charge.

Where, upon trial of murder, the court gave the usual and customary charge on presumption of innocence and reasonable doubt, and in another and separate paragraph from the court's charge on principals instructed the jury that if there were no design and intent to commit the offense, or if deceased was killed by one or more persons acting independently of any design in which defendant participated, to acquit the defendant, and if they had a reasonable doubt of such fact to acquit him, a complaint that the court should have charged the converse proposition in his charge on principals was untenable.

### 16.—Same—Charge of Court—Arrest Without Warrant.

Where the officer's right to arrest without warrant was not an issue in the case in so far as the killing of the deceased was concerned, there was no error in the court's failure to charge thereon.

### 17.—Same—Charge of Court—Principals—Presence of Defendant.

Where, upon trial of murder, the appellant contended that the court, in his main charge, did not instruct the jury that the mere presence of the party at the commission of an offense does not constitute him a principal, and the mere knowledge that an offense is about to be committed will not make a party a principal, but there must be a combination of both acts and intent, yet the special charge given at the request of the defendant covered every phase of this matter, there was no reversible error.

### 18.—Same—Charge of Court—Accomplice.

Where defendant was charged with others as a principal of the crime of murder, he could, of course, not be tried as an accomplice, and there was no error in the court's refusal to give a special requested charge to acquit the defendant if he was an accomplice, the evidence showing that the defendant acted as a principal, in the unlawful undertaking in which all the parties were engaged and in which the killing of human beings was one of the probable and contemplated results. Following Bass v. State, 59 Texas Crim. Rep., 186.

### 19.—Same—Conflict in Charge of Court—Principals—Accomplice.

Where appellant contended that the court's main charge and the special charge given at request of appellant were in conflict in defining the law of principals, but a perusal of the record of these charges refutes this contention, and no objection was filed to the charge of the court on this specific ground at the time of the trial, there was no reversible error; and even though the court's definition of principals might be objectionable to some state of facts, but was not so in the instant case, as the question of accomplice was not raised by the evidence. Following Glascow v. State, 50 Texas Crim. Rep., 635, and other cases. Davidson, Judge, dissenting.

Appeal from the District Court of Frio. Tried below before the Hon. J. F. Mullally.

Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*R. W. Hudson* and *J. L. Pranglin* and *Magus Smith* and *W. F. Ramsey* and *C. L. Black,* for appellant.—On question of the court's

charge on principals: Davis v. State, 55 Texas Crim. Rep., 495, and cases cited in opinion.

On question of conflict in charge of court and special charge: Arcia v. State, 28 Texas Crim. App., 198; Scott v. State, 46 Texas Crim. Rep., 85; Barnett v. State, 55 id., 182; Barnes v. State, 61 id., 37; Drysdale v. State, 70 Texas Crim. Rep., 273, 156 S. W. Rep., 685; Silvas v. State, 71 Texas Crim. Rep., 213, 159 S. W. Rep., 223; La Fell v. State, 69 Texas Crim. Rep., 307, 153 S. W. Rep., 884, and cases cited in opinion.

On question of return of indictment: Moore v. State, 46 Texas Crim. Rep., 520; Williams v. State, 17 Texas Crim. App., 521; Hardy v. State, 1 Texas Crim. App., 556; Walker v. State, 7 id., 52; Goode v. State, 57 Texas Crim. Rep., 220, 123 S. W. Rep., 597; Evans v. State, 34 Texas Crim. Rep., 110.

On question of admitting testimony of other transactions and offenses, and the acts and declarations of third parties: Branch's Crim. Law, sec. 338.

On question of res gestae: Deneaner v. State, 58 Texas Crim. Rep., 624.

On question of court's charge on acts and declarations of co-conspirators: Branch's Crim. Law, sec. 241; Lara v. State, 48 Texas Crim. Rep., 568; Webb v. State, 47 id., 306; Goodman v. State, 47 id., 388.

On question of offense against the United States not cognizable by State court: Cain v. State, 20 Texas, 355; State v. Randle, 41 id., 292; Johnson v. State, 4 Texas Crim. App., 63.

On question of limiting evidence to issue on trial: Brown v. State, 54 Texas Crim. Rep., 121; Ware v. State, 36 id., 597; Barkman v. State, 41 id., 105.

*C. E. Lane,* Assistant Attorney General, for the State.—On question of principals: Bowers v. State, 24 Texas Crim. App., 542; Cox v. State, 8 id., 254; Mitchell v. State, 36 Texas Crim. Rep., 278; Henry v. State, 54 S. W. Rep., 592.

HARPER, JUDGE.—The indictment in this case alleges that "The grand jurors, for the County of Dimmit, State aforesaid, duly organized as such at the September term, A. D. 1913, of the District Court for said county, upon their oaths in said court present that J. M. Rangel, Leonardo L. Vasquez, Abran Cisneros, Domingo R. Rosas, Bernardino Mendoza, Augennio Alzalde, Luis Mendoza, Lino Gonzales, Miguel P. Martinez, L. R. Ortiz, Jesus Gonzales, J. A. Serrato, Pedro Perales, Delipe Sanchez, Charles Cline, and Dan Daniels, alias Dynamiter Dan, acting together, on or about the 11th day of September, A. D. 1913, and anterior to the presentment of this indictment, in the County of Dimmit and State of Texas, did then and there unlawfully, with malice aforethought kill Candelario Ortiz, by shooting him with a gun."

The venue was changed to Frio County, and a trial had there. The

facts would disclose that the sheriff of Dimmit County was informed that guns, ammunition, etc., were being shipped into his county and unloaded at a small station some six miles from the county seat; that strangers were gathering in his county, and he gathered together Deputy Sheriffs Buck and Ortiz and City Marshal White, and the four began an investigation of the matter. Circumstances led them to follow a trail leading to the Capones ranch, and when they arrived near the Capones windmill and a little creek, which had a growth of underbrush on its banks, they waited until daylight, and then the sheriff and city marshal took one trail leading down to the branch, and the two deputy sheriffs took another trail leading in the same direction. Upon turning a bend in the branch Messrs. Buck and Ortiz faced some eighteen men with rifles drawn, who captured them and carried them to their camp, where they had guns, pistols, ammunition, cartridges, dynamite, bayonets and other implements of war. About the time these men arrived at the camp with the two deputies as prisoners, shots were heard in the direction that Sheriff Gardner and Marshal White had gone, and some of those who had captured the two deputies rushed over in that direction, while others held the two deputy sheriffs. Shortly they were called over to where the others were, and there lay a dead Mexican on whose person was afterwards found a red flag with the words, "Partido Liberal Mexicano. Tierra y Libertad," emblazoned thereon, meaning, "The Liberal Party of Mexico. Land and Liberty." There was also found in the creek at the camp later a bugle. The entire party capturing the deputy sheriffs were Mexicans, except one, an American named Cline. They had a captain elected named Rangel. When the party got over to where the dead Mexican was the sheriff and marshal were seen at some distance, and Cline called to the sheriff and marshal to come there. As they started to do so Deputy Sheriff Buck called to them not to do so, and when he did so a general fusillade was opened on the sheriff and city marshal, who fled. Mr. Buck testifies that appellant was one of the men with rifles who captured Ortiz and himself, and that he also was one of the men who fired on the sheriff and marshal. Appellant admits his presence, but denies that he was one of the party who captured the two deputies, and denies that he fired on the sheriff. Seeing that their rendezvous was discovered, Captain Rangel and all of his men made arrangements to at once depart in the direction of the Mexico line. They each took a rifle and pistol and a lot of ammunition and supplies, and tying Buck and Ortiz's hands behind them, loaded them with supplies, making pack-horses of them. They traveled through the brush some three or four miles. When they came to a bank, a hard climb, Ortiz attempted to climb but failed to do so, Buck succeeding in doing so. Buck says at the time they were captured three or four of the captors told Captain Rangel that Deputy Sheriff Ortiz was one of the men who had been informing on them, when the captain remarked he would inform no more—that they would kill him. After his ineffectual attempt to climb the hill, Ortiz remarked that he could not climb, loaded as he was, with his hands tied behind him, and if they were

going to kill him, they had just as well do it then.   The captain ordered all except four men to proceed with Mr. Buck, and after they had traveled some forty steps Mr. Buck and those with him heard a volley of shots, and Captain Rangel and those remaining with him shortly thereafter joined the others.   Ortiz was found at this point that night with five bullet wounds in his body, any one of three of them being fatal. The party proceeded then on their way, forcing Buck along.

The sheriff, when he escaped, proceeded to organize a posse, and that evening about 4 o'clock Captain Rangel and his band, after a parley, agreed to deliver Mr. Buck to the posse if the posse would agree not to pursue the captain and his men any further, and would give them a statement that they were to be allowed a passport.   This was agreed to and Mr. Buck was delivered to the posse.   At this time the posse was informed that Ortiz was tied to a tree near the point where Buck had last seen him.   The posse departed and sent men to relieve Ortiz.   When they got to the point designated they found him dead as hereinbefore stated.   Another posse was organized by the sheriff, and Captain Rangel and his company again pursued, this time Lieutenant Allen of the U. S. Army and some of his soldiers, joining in the pursuit.   The next day they were overtaken near the line of Mexico.   As the posse approached two volleys were fired at the posse; these shots were returned, when Captain Rangel and his men raised a flag of truce and surrendered. There were two dead and thirteen of the men named in the indictment captured.   Appellant was seen to flee while the shooting was going on, and the next day he was found near this place by Mr. Carrigan, who took charge of him, and he was incarcerated in jail with the others.   Cline said that their "orders were to shoot anything except American soldiers; to kill any sheriff's posse, or any citizens that might come,—to fight to a finish."   It is conclusively shown that this band had organized to invade our sister Republic, Mexico, for exactly what purpose is not disclosed by the record, except that it was an armed force.

As the transcript of the proceedings from the District Court of Dimmit County to the District Court in Frio County only showed that "on this the 15th day of September, 1913, the Honorable Grand Jury appeared in open court and presented the following true bill of indictment: No. 553, State of Texas v. J. M. Rangel et als.," a motion was made in the District Court of Frio County, after change of venue, to abate or quash the indictment, on the ground that the entry made in the minutes of the District Court of Dimmit County as disclosed by the transcript did not show that "a quorum of the grand jury" was present when the indictment was presented.   The language used in the minutes would, taken literally, embrace the entire grand jury, for it says, "the honorable grand jury appeared in open court and presented the indictment," and article 232 of the Code of Criminal Procedure says, "an indictment is to be considered as 'presented' when it has been duly acted upon by the grand jury and received by the court."   The entry made would be in literal compliance with this law, but appellant insists that Rule 110, adopted by the Supreme Court, provides, "The record should show, and

it should appear in the transcript of the record for the Court of Criminal Appeals: First. That the indictment was presented in open court, a quorum of the grand jury being present," and that as this entry in the minutes does not specifically state that a quorum of the grand jury was present, the indictment should be abated. If this motion had been made in the court where the indictment was returned, it would have been proper to have the entry made in the minutes amended so as to conform to the requirements of the rule, but the question here presented is, can this motion be made in the District Court of Frio County, after the venue had been changed, which court would have no control over, nor power to order or permit amendments to the minutes of the District Court of Dimmit County? Appellant earnestly insists that the motion can be made in the District Court of Frio County, and that court would have no option but to abate the indictment. He presents the question at length in a very able and exhaustive brief, and contends that the case of Caldwell v. State, 41 Texas, 86, was rendered when the statute was different from what it now appears to be—that the articles of the Code were amended relating to change of venue in the revision of 1876, and while the rule announced in the Caldwell case had seemingly been followed in all the decisions since then, yet appellant contends that the rule therein announced is not a proper construction of our present statute, and the Caldwell case has been followed because the court's attention had not been called to the change in the statute. The principles of law announced in the Caldwell case by Judge Roberts are not dependent entirely upon statutory enactments, but are in accordance with the recognized rules of law governing all such matters—that motions which do not go to the merits of the case or substance of the indictment, but which go only to some matter of procedure, such as the entry of an order, and which could have been amended, corrected or entered by order of the court, must be made before announcement of ready for trial, and in the court where the proceedings were had or indictment returned.

Article 630 of the Code of Criminal Procedure, which provides that before a change of venue is ordered in any case, all motions to set aside the indictment, and all special pleas and exceptions which are to be determined by the judge, *and which have been filed,* shall be disposed of by the court, and, if overruled, the plea of not guilty entered, was not intended to deprive a defendant of any substantial right, but was passed as much in his interest as in the interest of the State—to compel the judge before changing the venue to pass on all pleas on file and enter judgment thereon, and if he erred, such error might be reviewed on appeal. But we think if no pleas of any character, other than that of not guilty, as in this case, are made, only such pleas as go to the merits or matters of substance in the indictment can be presented after the case has passed from the control of the court in which the indictment was returned. This was the holding of Judge Roberts in the Caldwell case, and we think the correct holding. If appellant had filed a sworn plea alleging as a fact that a quorum of the grand jury was not present

when the indictment was returned, the court should have heard evidence on it, or any other plea which went to the merits or substance of the indictment, because our Constitution provides that no man shall be tried except upon indictment duly returned by a grand jury, and if a plea raises a question that an indictment has not been so found and returned into court, it presents a question of fact upon which the court should hear evidence and act' thereon, for this question can be raised at any time, and in any trial court where the case may be pending. But when there is no plea alleging that a quorum of the grand jury was not present when the indictment was found and presented in court, but only an allegation that the minutes of the court do not show this fact, this presents a matter as to mere matter of form, which if called attention to in the court where the indictment was returned, could be corrected and amended, and does not go to the merits, for the indictment would be a *legal one* if found and presented by a quorum of the grand jury, if the clerk had in fact made no entry in his minutes—the neglect of the clerk would not nullify the legal act of the grand jury and the court when the question was raised could order the entry then made in the minutes. Not only has this been the rule in all the cases cited by appellant, towit: Goode v. State, 57 Texas Crim. Rep., 220, 123 S. W. Rep., 597; Evans v. State, 34 Texas Crim. Rep., 110; Loggins v. State, 8 Texas Crim. App., 434; Ex parte Cox, 12 Texas Crim. App., 665; Barr v. State, 16 Texas Crim. App., 333; English v. State, 18 S. W. Rep., 607, but in all cases decided by this court. We want to commend counsel for fairly stating the holding of the court heretofore, and citing the authorities, but we can not agree with him as to the distinction he tries to draw. He thinks that they proceed upon incorrect interpretation of the statute, or that the amended statute had been overlooked, and that the holding was that article 630 of the Code of Criminal Procedure governed the matter, and the court based its holding on this article of the Code, while we think article 576 shows that the matters complained of in appellant's plea are matters of form, and as said by Judge White in Barr v. State, 16 Texas Crim. App., 333, on page 335: "Irregularities in the *record entry of the presentment of an indictment* do not constitute cause for setting aside the indictment, or in arrest of judgment. Such matters should be mooted by suggestion *in limine to the court wherein the indictment was presented,* and are not available in a different forum to which the venue has been changed." In the case of Hamilton v. State, 65 Texas Crim. Rep., 608, 145 S. W. Rep., 348, are collated a number of authorities in this State holding that where the matter complained of does not relate to a matter of substance but of form only, such complaint must be timely made, and at a time when the trial court could have the matter corrected if the facts justified it in so doing. The court did not err in refusing to quash the indictment.

Appellant also moved to quash the special venire drawn. While this matter is not presented in the brief filed in this court, yet we have care-

fully scrutinized the papers relating thereto, and the venire was drawn, served and returned in accordance with the provisions of the law.

In a number of bills of exception appellant complains of the introduction of any testimony as to what was said or done by Captain Rangel or any of his company after the death of Ortiz until their arrest, his contention being that if the State relied on a conspiracy to kill Ortiz to hold appellant as a principal, then after the accomplishment of that act, the acts, conduct and words of his co-conspirators would not be admissible after the accomplishment and end of the conspiracy. If appellant's premise was correct, that the State relied on a specific agreement and conspiracy to kill Ortiz and nothing else to prove its case, then undoubtedly his proposition would be correct, and the authorities cited by him so hold. But did the State allege or attempt to prove any agreement or specific agreement to kill Ortiz? Herein is where appellant is wrong in his premise. The State endeavored to prove, and the evidence tended to show only that Captain Rangel had organized a company to invade Mexico; that they selected a point in Dimmit County to gather and rendezvous; that appellant joined this company, knowing its object, intent and purpose, and its accomplishment, agreement or conspiracy, whichever you may call it, was not at an end when the parties were arrested, but they and all of them were at that time engaged in furtherance of that agreement or conspiracy, and the evidence amply supports this conclusion, that the killing of Ortiz was an incident to the conspiracy and an accomplishment of the agreement, and whether or not appellant could be held as a principal in the killing of Ortiz, he firing none of the shots, is a fact to be gathered from all the facts and circumstances attendant upon the agreement or conspiracy and the efforts to accomplish it and in furtherance of it. That this company was gathered together, organized and equipped for an illegal purpose is amply shown by all the testimony, and is admitted by appellant in his testimony. But he most emphatically denies that there was any agreement to kill Ortiz or anyone else in Dimmit County so far as he knew; that he entered into no such agreement or conspiracy. The conspiracy or agreement shown by the record and admitted by appellant was not at an end until the time of their arrest and incarceration in jail. The question as to whether or not the facts and circumstances connect appellant with the killing of Ortiz sufficiently to bind him as a principal is another question, but the court certainly did not err in admitting the testimony, as it all had a bearing on that issue. It has always been the rule in this State that the acts and declarations of one conspirator in furtherance of the common design are admissible against another conspirator pending the conspiracy and until its final termination. This proposition includes anything that was within the contemplation of the conspiracy, such as dividing the spoils, or any of those matters that may be subsequent to, but included in the scope of the conspiracy. O'Neal v. State, 14 Texas Crim. App., 582; Rix v. State, 33 Texas Crim. Rep., 353, 26 S. W. Rep., 505; Franks v. State, 36 Texas Crim. Rep., 149, 35 S. W. Rep., 977; Small v. State, 40 S. W. Rep., 790; Long v. State;

55 Texas Crim. Rep., 55, 114 S. W. Rep., 632; Gracy v. State, 57 Texas. Crim. Rep., 68, 121 S. W. Rep., 706; Milo v. State, 59 Texas Crim. Rep., 196, 127 S. W. Rep., 1025; Kipper v. State, 45 Texas Crim. Rep., 377, 77 S. W. Rep., 611; Holt v. State, 39 Texas Crim. Rep., 282, 46 S. W. Rep., 829; Eggleston v. State, 59 Texas Crim. Rep., 542, 128 S. W. Rep., 1105. And what is said and done by any of the conspirators, pending the conspiracy and in furtherance of the common design, is admissible against the one on trial, though said and done in his absence. Wallace v. State, 46 Texas Crim. Rep., 341, 81 S. W. Rep., 966; Barber v. State, 69 S. W. Rep., 515; Trevino v. State, 38 Texas Crim. Rep., 64, 41 S. W. Rep., 608; Dobbs v. State, 51 Texas Crim. Rep., 113, 100 S. W. Rep., 946; Roma v. State, 55 Texas Crim. Rep., 344, 116 S. W. Rep., 598; Cox v. State, 8 Texas Crim. App., 254; Smith v. State, 21 Texas Crim. App., 96, 17 S. W. Rep., 560; Armstead v. State, 22 Texas Crim. App., 51; Slade v. State, 29 Texas Crim. App., 381, 16 S. W. Rep., 253; Richards v. State, 53 Texas Crim. Rep., 400, 110 S. W. Rep., 432; Bowen v. State, 47 Texas Crim. Rep., 137, 82 S. W. Rep., 520; Williams v. State, 45 Texas Crim. Rep., 240, 75 S. W. Rep., 509; Chapman v. State, 45 Texas Crim. Rep., 479, 76 S. W. Rep., 477; Hannon v. State, 5 Texas Crim. App., 549; Taylor v. State, 3 Texas Crim. App., 169; Moore v. State, 15 Texas Crim. App., 1; Eggleston v. State, 59 Texas Crim. Rep., 542, 128 S. W. Rep., 1105.

And as to the general rule governing these matters Mr. Phillips in his work on Evidence says: "It is an established rule that when several persons are proved to have combined together for the same illegal purpose, any act done by one of the party in pursuance of the original concerted plan with reference to the common object is, in contemplation of law, the act of the whole party.' Ph. on Ev. (5th ed.), 168. And proof of the plot or combination must precede proof of declarations made by either of the conspirators, though the acts and declarations of separate parties in the planning or execution of the scheme may be shown in evidence of the common design. State v. Simmons, 4 Strobh., 266; Regina v. Mear, 1 Eng. Law & Eq., 581; State v. Ripley, 31 Me., 386; Glory v. State, 13 Ark., 236; Hardin v. State, 4 Texas Crim. App., 355.

"The correct rule is also stated by Mr. Greenleaf. He says: 'The same principles apply to the acts and declarations of one of a party of conspirators in regard to the common design as affecting his fellows. Here a foundation must first be laid by proof sufficient, in the opinion of the judge, to establish prima facie the fact of conspiracy between the parties, or proper to be laid before the jury as tending to establish such fact. The connection of the individuals in the unlawful enterprise being thus shown, every act and declaration of each member of the confederacy in pursuance of the original concerted plan and with reference to the common object is, in contemplation of law, the act and declaration of them all, and is, therefore, original evidence against each of them. It makes no difference at what time anyone entered into the conspiracy. Everyone who does enter into a common purpose or design is generally

deemed in law a party to every act which may afterwards be done by any of the others, in furtherance of such common design.' "

Doubtless appellant will accede to all these rules of law, and admit that the testimony would be admissible against him if he was being prosecuted for engaging in this conspiracy, but he may contend that as he was being prosecuted for a matter that grew out of and was incident to this conspiracy, it should not be admitted against him unless it be shown that he was in some way connected with the offense which was committed by another during the time of the conspiracy and while the object and purpose of the conspiracy was being furthered and actively engaged in by all of the conspirators, including appellant. As to whether the killing of Ortiz was in furtherance of the common purpose of all, and if so was legally within the contemplation and agreement of them all, is a question that arises in the case, and necessarily all the acts and conduct of each of the parties during the existence and while actively engaged in the furtherance of the common purpose and design, would be admissible on that issue. In the case of Mitchell v. State, 36 Texas Crim. Rep., 310, this court, speaking through Judge Hurt, says: " 'If several conspire to invade a man's household, and go to it, armed with deadly weapons, to attack and beat him, whereupon one gets into difficulty with him and kills him, the rest are guilty also of murder, though they did not mean it.' 1 Bishop's New Crim. Law, sec. 633, subdiv. 5; citing Williams v. State, 81 Ala., 1; 1 South., 179. 'Where two combine to fight a third with fists, if death accidentally results from a blow inflicted by one, the other also is answerable for the homicide. But if the one resorts to a deadly weapon without the other's knowledge or consent, he only is thus liable.' 1 Bishop's New Crim. Law, sec. 637, subdiv. 5. Mr. Bishop deduces the following rules on the subject: 'The rules to determine responsibility are, in reason, and fairly well deducible from the modern authorities, substantially as follows: One is responsible for what of wrong flows directly from his corrupt intentions, but not, though intending wrong, for the product of another's independent act. If he set in motion the physical power of another, he is liable for its result. If he contemplated the result, he is answerable though it is produced in a manner he did not contemplate. If he did not intend it in kind, yet if it was the ordinary effect of the cause, he is responsible. If he awoke into active and indiscriminate power, he is responsible. If he gave directions vaguely and incautiously, and the person receiving them acted according to what he might have foreseen would be the understanding, he is responsible. But if the wrong done was a fresh and independent product of the mind of the doer, the other is not criminal therein merely because, when it was done, he meant to be a partaker with the doer in a different wrong.' Id., sec. 641. It follows, then, if the authorities cited enunciated the correct doctrine on this subject, that if the defendant and Kane Neal combined together to whip or beat the deceased, and to do so at all hazards, and, if necessary to that end, to take his life, in case he resisted it or fled from it, that one would be responsible for the act of the other. If, in such case,

they came upon him, and he resisted being beaten, and, in order to accomplish their common purpose, they either killed him with a picket or a pistol, it would be murder. If he fled from them to avoid being whipped, and they killed him with a picket or a pistol in his flight, it would be murder—that is, if the picket was in its nature, as used, a dangerous and deadly weapon, and what was done with it or with the pistol was directly and immediately dangerous to the life of the deceased; and so, if he submitted, and they beat him with a picket or a pistol, in a manner directly and immediately dangerous to his life, and death resulted, both would have been guilty of murder—that is, if the parties in their joint agreement contemplated the result, the defendant would be answerable, though it was produced in a manner he did not contemplate. If he did not intend it in kind, yet if it was the ordinary effect of the cause, he is responsible."

It is thus seen that if the crime committed is not in any way connected with the common purpose and design, but is an independent act of one of the parties, although he did it while engaged in the design, the others would not be legally responsible for such independent act, but if the crime was in furtherance of the common purpose and design, and the facts show that it was such an offense as might have been and should have been contemplated by the parties would be the result of the execution of the common design, and it was so executed, then all engaged in the unlawful purpose are equally guilty of the offense, although they, at the time, may have been engaged in some other part of the common purpose and design. And as all the evidence adduced was pertinent to show whether or not the killing of human beings was in contemplation of the parties if necessary to accomplish their unlawful design, the court did not err in admitting in evidence all the testimony from the time Ortiz and Buck were captured until the conspiracy was put an end to by the capture of the conspirators and the breaking up of the conspiracy.

It is also contended that the court erred in admitting in evidence the flag with the words, "The Liberal Party Mexico. Land and Liberty," emblazoned thereon, and the bugle found at the camp. It was necessary for the State to show that the parties had gathered there and were engaged in an unlawful design, and this was cogent evidence of that fact, together with the other facts and circumstances. But it is insisted that this only tended to show that parties were formed in a company to violate the neutrality laws, and, therefore, a violation of the United States Penal Code and not the laws of Texas. While the evidence conclusively shows that they had gathered there for the purpose of violating that law, yet it does not preclude the fact that by their acts and conduct they were also violating the law of this State. Chapter 1 of Title 18 of the Penal Code provides that a conspiracy is an agreement entered into between two or more persons to commit any of the offenses named in that chapter, and embraces an agreement to commit any felony, and also provides that a conspiracy entered into in this State for the purpose of committing a felony in any foreign country shall be punished in the same manner as if the offense was to have been committed in this coun-

try. Under the laws of all nations the inciting of rebellion and organization of armed forces against the acting government is a felony of very grave grade, and that this company had organized, elected officers, secured arms and all the munitions of war is amply shown by the record under an agreement to enter Mexico for an unlawful purpose and for the purpose of resisting the legally constituted authorities. So they had violated and were engaged in violating not only the laws of the United States but the laws of this State as well, and could be prosecuted for conspiracy in this State.

It is insisted that the sheriff and his deputy were in the wrong in proceeding to or near this camp for the purpose of making an investigation; that no complaints had been filed, and they had no warrants of arrest. This is foreign to any issue in the case, for if the sheriff and his deputies had been in the wrong in making an investigation it would furnish no excuse or justification for the killing of Ortiz some three hours later, after the sheriff had fled, and Ortiz was in their power. But we do not think the sheriff or his deputies are subject to any censure for their acts, but they are rather to be praised. The sheriff had information furnished that arms and ammunition were being shipped into his county and being unloaded at a small wayside station; that strangers were also gathering in his county, and getting these dangerous implements and carrying them no man knew whither. We think it commendable in him for the protection of his people, that he deemed it his duty to make suitable investigation of the object and purpose of these men in gathering there and having shipped to them guns, ammunition, dynamite, etc. It may be said that as they were of the Mexican race, and there was internal war in progress in Mexico, it might be surmised that they were bound thither and no danger threatened the citizens of Dimmit County. If one had so surmised, the facts indicate he would have been correct, yet no one knew that to be the purpose and object when the sheriff began his investigation, and if he had so known, it would have been the duty of the sheriff to have made the investigation, learned their names, filed complaints against them and arrested them. As said before, no censure or blame is attachable to the sheriff or his deputies for seeking to ascertain the true facts; they had endeavored to make no arrests at the time Buck and Ortiz were seized, and when these two deputies were seized illegally in the presence and sight of the sheriff, it was his duty to organize a posse, pursue and capture the men who had thus kidnaped two officers of the law who were simply performing their duty under their oath. And when it was ascertained that Deputy Sheriff Ortiz had been slain by them, it was his duty to use all necessary force to pursue and capture them. It was not possible to file complaint, for he did not know who they were, and if he had taken time to ascertain their names and then file complaints, the appellant and his co-conspirators would have been beyond his jurisdiction and in the Republic of Mexico ready to further pursue their unlawful enterprise.

As shown by the testimony, appellant escaped when the majority of

his companions were captured; the next day he was detected in the brush by Mr. Carrigan, who was not an officer of the law. When he and Mr. Carrigan met a conversation ensued, and appellant objected to this conversation being introduced in evidence, on the ground that he was then under arrest. Mr. Carrigan was a ranchman, and there was nothing in his appearance or conduct to lead appellant to believe or even suspicion that he contemplated taking him in charge and delivering him to the officers. Under such circumstances there was no error in admitting appellant's statements, made at that time, in evidence. Williams v. State, 53 Texas Crim. Rep., 2; Hart v. State, 15 Texas Crim. App., 202; Grant v. State, 56 Texas Crim. Rep., 411; Craig v. State, 30 Texas Crim. App., 619; Martin v. State, 57 Texas Crim. Rep., 264; Frye v. State, 66 Texas Crim. Rep., 166, 146 S. W. Rep., 199.

Appellant took the witness stand in his own behalf, admitting that he was at the rendezvous and was with the parties at the time Buck and Ortiz were captured by Captain Rangel and his company, but said he did not participate in their capture, as he was sitting down by a tree; he admitted the shooting at the sheriff and the city marshal, but says he did not participate therein; he admitted that Buck and Ortiz were tied and made pack-horses of, but says he took no part in tying them or loading them down; he admits that he was with the company when they compelled Buck and Ortiz to go with them, but denies participation in such conduct; he admits that he was present when they came to the slippery hill that Ortiz could not or would not climb loaded as he was, and that Captain Rangel told him and the others to go on, and they did so, taking Buck with them, and after they had gone forty or fifty yards he heard the shots, but says he did not know they intended to kill Ortiz, or had done so, until some time thereafter, when he expressed his disapproval of such an act. Thus it is seen that he made himself a witness, and testified to very material facts in his defense, and if believed by the jury they might have acquitted him of being a party to the killing of Ortiz. And having taken the witness stand voluntarily, he became subject to cross-examination the same as any other witness, and the court did not err in so holding. Morales v. State, 36 Texas Crim. Rep., 234; Brown v. State, 38 Texas Crim. Rep., 597; Oliver v. State, 33 Texas Crim. Rep., 541; Jackson v. State, 33 Texas Crim. Rep., 281. While defendant testified as above stated, Deputy Sheriff Buck testified that defendant was one of the men who had their guns leveled on him and Ortiz when they were captured; that defendant informed Captain Rangel that Ortiz was a spy who had been reporting on them to the officers, when the captain replied that he, Ortiz, would report no more, for they would kill him, Ortiz, and defendant did not protest but by silence acquiesced in this statement of the captain; that defendant was one of the men who rushed over and attempted to capture the sheriff and marshal also and fired on them while they were fleeing; that defendant was present actively participating in all the preparations of departure when he and Ortiz were tied and loaded down; that defendant was one of the men who had him in charge, and marched near him; that defend-

ant was present when Ortiz declined to climb the hill, and said they had as well kill him as any other time; that defendant was one of the men who had charge of him (Buck) and marched him on when the captain told them to go ahead, and that defendant and others marched him off forty or fifty steps and then waited until Captain Rangel and those who actually shot Ortiz came up; that defendant was one of the guards who drove him (Buck) on with epithets and threats, and punched him with his rifle; that defendant was present when the posse approached to secure his release, and when he was informed that if the posse fired he, Buck, would be the first one killed; and that defendant was one of those who arranged themselves in a V shape to capture the posse, being armed all the time with a rifle and pistol. So if Buck is to be credited appellant was an active participant in all the proceedings up to the time Buck was released, except in the actual firing of the shots that killed Ortiz, and at this time he was in charge of Buck not over forty or fifty yards away, and waited until those who did fire the shots caught up. And the evidence further shows that after Buck's release appellant remained with Captain Rangel's company until they were overtaken the next day, and was present when the two volleys were fired at the posse; he then escaped, but was captured the next day still armed with his rifle; and Cline says the agreement was to kill any citizen or posse who interfered with their unlawful design and purpose. The court charged the jury:

"In order to warrant a conviction of a crime on circumstantial evidence, each fact, necessary to the conclusion sought to be established, must be proved by competent evidence, beyond a reasonable doubt; all the facts (that is, the facts necessary to the conclusion) must be consistent with each other and with the main fact sought to be proved; and the circumstances, taken together, must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that the offense was committed by the accused or by other persons (as charged in the indictment) with whom he was acting together as a principal in the execution of a common design to commit the offense charged (if he was so acting), and that such offense was not committed by any other person.

"But in such cases it is not sufficient that the circumstances coincide with, account for and therefore render probable, the guilt of the defendant. They must exclude, to a moral certainty, every other reasonable hypothesis, except the defendant's guilt, and unless they do so, beyond a reasonable doubt, you will find the defendant not guilty."

And under this charge we think the evidence amply sufficient to support the verdict, for the facts and circumstances in this case authorized the jury to find that the killing of Ortiz was in pursuance of the common purpose and design, and especially is this true of appellant, whom Buck says told Captain Rangel that Ortiz was one of the spies watching their movements, and silently acquiesced when Rangel replied he will report no more for we will kill him, and when Ortiz refused to go on

they did kill him, if for no other reason than to keep him from reporting on them and frustrating the execution of their purpose and design.

But appellant says in compelling him to testify in regard to their organization and purposes, the State was compelling appellant to disclose he had committed another and different crime, conspiring to violate the neutrality laws of the United States. The State did not place appellant on the stand and could not do so, and when.he voluntarily took the stand and testified, then he could be cross-examined, and if in developing the case for which he was being tried the evidence necessarily disclosed he had committed other and different crimes in connection with this one, evidence of such other crimes would be admissible if it shed light on the offense for which he was being tried. As said in Craig v. State, 23 S. W. Rep., 1108, and Stovall v. State, 97 S. W. Rep., 92, any competent evidence which tends to defeat the defense urged is admissible, though it tends to show appellant is also guilty of another offense, and this even though he has been acquitted of such other offense. And it has always been the rule that when extraneous crimes are res gestae of the offense on trial, or tends to show the intent with which the person on trial acted when such intent is an issue in the case, or which tends to connect the defendant with the offense for which he is on trial, it is admissible. Gilbraith v. State, 41 Texas, 567; Long v. State, 11 Texas Crim. App., 381; Davison v. State, 12 Texas Crim. App., 214; McCall v. State, 14 Texas Crim. App., 353; Holmes v. State, 20 Texas Crim. App., 509; Harwell v. State, 22 Texas Crim. App., 251; Kelly v. State, 31 Texas Crim. Rep., 211; Sisk v. State, 42 S. W. Rep., 985; Fielder v. State, 40 Texas Crim. Rep., 184; Stanfield v. State, 43 Texas Crim. Rep., 10. And when defendant takes the stand as a witness he is subject to the same rules as any other witness. He may be impeached, attacked, sustained, bolstered up, made to give evidence against himself, cross-examined as to new matter, and treated in every respect as any other witness testifying in behalf of defendant. Hare v. State, 56 Texas Crim. Rep., 6, 118 S. W. Rep., 544; Mirando v. State, 50 S. W. Rep., 714; Jackson v. State, 33 Texas Crim. Rep., 281; Hutchins v. State, 33 Texas Crim. Rep., 298; Huffman v. State, 28 Texas Crim. App., 174, 12 S. W. Rep., 588; Brown v. State, 38 Texas Crim. Rep., 597, 44 S. W. Rep., 176; Pyland v. State, 33 Texas Crim. Rep., 382; Thomas v. State, 33 Texas Crim. Rep., 607; Hargrove v. State, 33 Texas Crim. Rep., 431, 26 S. W. Rep., 993; May v. State, 33 Texas Crim. Rep., 74; Monticue v. State, 40 Texas Crim. Rep., 528; Hamblin v. State, 41 Texas Crim. Rep., 135; Alexander v. State, 40 Texas Crim. Rep., 395, 49 S. W. Rep., 229; Brown v. State, 57 Texas Crim. Rep., 269, 122 S. W. Rep., 566; McFadden v. State, 28 Texas Crim. App., 241, 14 S. W. Rep., 128; Mendez v. State, 29 Texas Crim. App., 608, 16 S. W. Rep., 766.

In this case the conspiracy to violate the neutrality laws and the killing of Ortiz were certainly res gestae of each other—parts of the same transaction according to the testimony offered by the State.

There was no effort made to prove, and the State did not rely on a

conspiracy formed to specifically kill Ortiz, therefore the court did not err in refusing the special charges presenting that issue. It is always proper to refuse charges presenting an issue not even suggested by the testimony. The conspiracy relied on by the State was the agreement conclusively shown, for all the-parties named in the indictment to gather at a point near Carrizo Springs, in Dimmit County, to which place the arms, ammunition, dynamite, etc., were carried, and when the company was completed, to go into Mexico on an unlawful mission, and the facts and circumstances would authorize a jury to find that embraced in the conspiracy was an agreement to resist all efforts to prevent the execution of their agreed purpose, even unto death, and in the furtherance of said design and as contemplated incident to it Ortiz was killed, and that being the issue, and not whether there was a specific conspiracy to kill Ortiz, the court correctly refused the charges requested.

Neither did the court err in refusing the special charge requesting the court to instruct the jury not to consider any testimony in the case concerning carrying arms and ammunition into a foreign country, as such acts are not penal by the laws of the State of Texas. This testimony was admissible as tending to show the formation of an unlawful conspiracy, and if the unlawful conspiracy was to commit a felony in a foreign country, it was a violation of the laws of this State.

The court did not err in refusing the special charges requesting him to instruct the jury not to consider any of the testimony concerning the acts and declarations of others than the defendant after the killing of Ortiz. This testimony was admissible as tending to show the purpose of the conspiracy formed, and as facts and circumstances to shed light on the killing of Ortiz, and as tending to show whether or not appellant was a principal in the killing of Ortiz. The court, in addition to the charge on circumstantial evidence hereinbefore copied, instructed the jury:

"All persons are principals, who are guilty of acting together in the commission of an offense. When an offense has been actually committed by one or more persons, the true criterion for determining who are principals is, did the parties act together in the commission of the offense; was the act done in pursuance of a common intent and in pursuance of a previously formed design in which the minds of all united and concurred. If so, then the law is that all are alike guilty, provided the offense was actually committed during the existence and in the execution of the common design and intent of all, whether in point of fact all were actually, bodily present on the ground when the offense was actually committed or not.

"If there was no such common design and intent of all, including the defendant, to commit the offense, or if the offense, if any, was committed by one or more, acting independently of the defendant in so doing and without participation by him in the design and intent to commit it, then the defendant is not guilty; and if you have a reasonable doubt as to this issue you must give the defendant the benefit of the doubt and acquit him."

"Now, if you believe from the evidence, beyond a reasonable doubt,. that the defendant J. A. Serrato, acting together with J. M. Rangel, Leonardo L. Vasquez, Abran Cisneros, Domingo R. Rosas, Bernardino Mendoza, Eugenio Alzalde, Luis Mendoza, Lino Gonzales, Miguel P. Martinez, L. R. Ortiz, Jesus Gonzales, Pedro Perales, Felipe Sanches, and Charles Cline, as a principal as hereinbefore defined, in the County of Dimmit and State of Texas, on or about the time alleged in the indictment, with a deadly weapon or instrument reasonably calculated and likely to produce death by the mode and manner of its use, and not in defense of himself against an unlawful attack, real or apparent, reasonably producing a rational fear or expectation of death or serious bodily injury, with intent to kill, did unlawfully and with malice aforethought shoot and thereby kill said Candelario Ortiz, as charged in the indictment, you will find him guilty of murder, as charged, and assess his punishment at death or by confinement in the penitentiary for life,. or for any term of years not less than five."

In addition to these charges, at the request of appellant, the court also instructed the jury:

"Gentlemen of the Jury: You are instructed by the court that the mere presence of a party at or near the scene of the commission of an offense does not make him a principal, and mere knowledge that an offense is about to be committed will not make the party a principal; nor will his knowledge that an offense is being committed, or has been committed; nor will his failure to give alarm, his silence or inaction make him a principal.

"Now, therefore, unless you believe from the evidence beyond a reasonable doubt that Jose A. Serrato was present at the time Candelario Ortiz was killed and that he knew both of the act of the killing and of the intent of the person who killed him, or unless you believe from the evidence beyond a reasonable doubt that the defendant Joe A. Serrato was not present at the scene of the killing, but was engaged in carrying out his part of a previously conceived design theretofore entered into with others to take the life of said Candelario Ortiz, and unless you believe from the evidence beyond a reasonable doubt that the defendant did some overt act in connection with the person or persons who did kill Candelario Ortiz, whoever they may be, and that he had a guilty knowledge, and had conspired, and confederated with the person or persons who did kill said Candelario Ortiz, before the act was done, then his mere presence at or near the scene of the killing, or his mere knowledge that such killing was about to be committed or had been committed, or his failure to give an alarm, or his silence or inaction, would not make him a principal, and you will acquit the defendant."

These charges, we think, fully presented the issues made by the testimony.

The first complaint to the court's charge is that the court nowhere in the charge defines "conspiracy." Defendant was not being prosecuted for the crime or offense of conspiracy, but was being prosecuted for the crime of murder, and evidence of a conspiracy was introduced as tending

to show that appellant was guilty as a principal in the crime of killing Ortiz, when he did not himself fire the fatal shot, therefore it was not necessary to define the crime of conspiracy, and in so far as that evidence and issue were concerned, it was sufficiently presented in the charge on circumstantial evidence, wherein the jury was specifically instructed in regard to the matter.

The next complaint of the charge is that in submitting the issue to the jury for a finding, that in that paragraph he did not charge the "converse of the proposition" and if they did not so believe they would acquit the defendant. The court gave the usual and customary charge on presumption of innocence and reasonable doubt, and in another and separate paragraph instructed the jury that if there was no common design and intent to commit the offense they would acquit defendant, or if Ortiz was killed by one or more persons acting independently of any design in which defendant participated, they would acquit the defendant, and if they had a reasonable doubt of such facts, they would acquit defendant. This paragraph presented his defense affirmatively, and it was unnecessary to include it in any other paragraph of the charge.

The next criticism is that the charge did not submit to the jury the right of Sheriff Gardner and those acting with him to arrest without warrant. Whether or not they had the right to arrest was not an issue in the case in so far as the killing of Ortiz was concerned. They had captured Ortiz, carried him off some three miles and there killed him, and were not arrested until the day after the killing had taken place.

The next criticism is that the court in his main charge did not instruct the jury "that the mere presence of a party at the commission of an offense does not constitute him a principal, and the mere knowledge that an offense is about to be committed will not make a party a principal; that to make a party a principal there must be a combination of both acts and intent." If this criticism should in any manner be said to be just, then the special charge given at the request of appellant covered every phase of this matter. And the Act of the last Legislature was passed requiring that appellant file his objections in writing that the court's attention might be called to any omission, and when the court was informed by appellant that he did not think the charge sufficiently covered these matters, the court gave the charge requested by appellant, and it certainly instructs the jury as appellant contends should have been done in these respects. In this court it is urged there is a conflict in the main charge and the special charge, and such conflict rendered unintelligible the instructions, appellant contending, first, "the two charges were directly conflicting and the jury in this state of the record was left with no safe or certain rule to guide them, and, in view of the manifest error in the court's charge which undertook to instruct the jury and did instruct the jury as to what under the law would constitute a principal, such error was not cured by the giving of a correct charge on the subject at the request of defendant. Second. This is particularly true since the court refused to give the special charge on the subject of accomplice

asked by us." We will consider the second objection first, and see whether or not the court ought to have instructed the jury the law as to the offense of accomplice, and if they found that he was an accomplice to acquit. It is a correct proposition of law that one charged in an indictment as a principal can not be convicted as an accomplice to the crime—they are separate and distinct offenses. McKeen v. State, 7 Texas Crim. App., 631; Rix v. State, 33 Texas Crim. Rep., 353; McAlister v. State, 45 Texas Crim. Rep., 258; Jones v. State, 57 Texas Crim. Rep., 144. Our statute defines an accomplice to be, first, one who is not present at the commission of an offense, but who before the act is done advises, commands or encourages another to commit the offense. The acts of appellant proven in this case do not bring him within the provisions of this definition, for he was with the parties from the time of the capture of Buck and Ortiz until long after the killing of Ortiz. Neither is it contended by the State that appellant advised, encouraged or commanded the persons who fired the shots to do so. Neither does the evidence suggest that appellant promised aid to those who committed the offense, and failed to do so. Whatever of aid the facts and circumstances would suggest that appellant promised in the enterprise engaged upon he was there on the ground actually extending it. Nor does the record suggest that appellant offered any of his co-conspirators any reward of any character, nor does the evidence suggest that he made any dire threats as to what he would do if Ortiz was not killed. The evidence does not show that appellant furnished the arms to kill Ortiz. The weapons, appellant says, were at the rendezvous when he arrived there, after having been induced to join them in their unlawful enterprise. As hereinbefore stated, the State did not rely upon any specific agreement or understanding to kill Ortiz, either to make appellant a principal or accomplice, but what the State sought to prove and relied on was proof of all the parties being engaged in an unlawful undertaking, and the killing of human beings was one of the probable and contemplated results if they were in any way interfered with in the accomplishment of their purpose, and the killing of Ortiz being deemed necessary by some of the conspirators in the furtherance of their joint project, appellant became a principal in the commission of the offense, it being the natural and not unexpected consequence of the conspiracy that the taking of human life might become necessary, the agreement entered into between the parties, also embracing such steps if deemed necessary. Therefore, the court did not err in refusing the special charge instructing the jury to acquit if they found appellant was an accomplice to the crime—the evidence did not raise such an issue. The evidence suggests only that appellant was a principal offender, and if not guilty of that, he would have no criminal connection with the killing of Ortiz. Our decisions hold that the dividing line between principals and accomplices is that to constitute one a principal he must be doing something in furtherance of the common design, at the time the offense is committed, whether present or not, while an accomplice is one who,

Vol. 74 Crim.-28.

though having advised and agreed to its commission, is not present when the offense is committed, and who is not doing anything at the time in furtherance of the common design, and the law governing this character of case is so well stated in Bass v. State, 59 Texas Crim. Rep., 186, 127 S. W. Rep., 1020, we refer to that case and the authorities there cited for a further discussion of this question.

As to the contention that the court's charge as given and the special charge given at the request of appellant being conflicting, we think a perusal of them refutes this contention. But in the brief it seems that the main contention is that the court erred in defining principals in instructing them "provided the offense was committed during the existence and in the execution of the common design and intent of all, whether in point of fact all were actually, bodily present on the ground when the offense was actually committed or not." While no objection was filed to the charge on this specific ground at the time of the trial, yet it is upon this ground that it is now contended that this part of the paragraph defining principals conflicts with the special charge given. Appellant cites us to the cases of Davis v. State, 55 Texas Crim. Rep., 495; Yates v. State, 42 S. W. Rep., 296; McDonald v. State, 46 Texas Crim. Rep., 4; Criner v. State, 41 Texas Crim. Rep., 290; Silvas v. State, 71 Texas Crim. Rep., 213, 159 S. W. Rep., 223; LaFell v. State, 69 Texas Crim. Rep., 307, 153 S. W. Rep., 884, and Drysdale v. State, 70 Texas Crim. Rep., 273, 156 S. W. Rep., 685. In these cases, under the facts adduced in evidence, a charge thus defining principals was held erroneous, but it may be as well said here that in the cases of Wright v. State, 40 Texas Crim. Rep., 45; Henry v. State, 54 S. W. Rep., 592; Ballew v. State, 48 Texas Crim. Rep., 46; Glascow v. State, 50 Texas Crim. Rep., 635, and other cases, a definition of principals containing the clause objected to by appellant in this case was held to present no reversible error under the facts in those cases. So at last, whether or not this charge is erroneous depends on the evidence on the trial of the case, and it is not always erroneous, and we think it presents no reversible error in this case.

In the Davis case, cited by appellant, it is said, there was no direct testimony of the presence of appellant at the time the animal was taken or killed, but his connection with the original taking was sought to be established by acts and conduct soon thereafter, and other facts are cited, and it is held by the court "as a necessary deduction and corollary of what we have said above it is evident that the court should have submitted to the jury the issue and question as to whether under the facts appellant was an accessory, accomplice or receiver of stolen property." In this case the evidence raises no such questions—he was either guilty as a principal or guilty of no offense. In the case of Jones v. State, 57 Texas Crim. Rep., 144, the court holds that the evidence raises the issue that Jones might be an accomplice or a receiver of stolen property, and for this reason the charge was held to be erroneous, the court in that case, in the main, discussing the true dividing line between accomplices, accessories and principals, and under the rules there laid

down, under the evidence in this case the issue of whether or not appellant was an accomplice would not be raised.

In the Yates case, supra, the court states that the evidence "only showed subsequent acts and conduct of the defendant, and agreed as well, indeed more strongly with the theory that he was not present at the time of the taking, but, if guilty at all, was guilty as a receiver of stolen ·property."

In the McDonald case, supra, the defendant's defense was an alibi— that he was not present and was at another and different place, and had no guilty connection with any part of the transaction.

In the Criner case, supra, it is said that "the acts of an accomplice are all done *prior to the commission* of the offense, and these acts, in order to constitute him an accomplice, would terminate his connection with the transaction." This is a correct rule of law and clearly demonstrates that the issue of whether or not appellant was an accomplice is not even suggested by the testimony in this case. It is further held in that case, that the facts raised the issue of whether or not he was a receiver of stolen property, and for this reason the charge that authorized appellant's conviction as a principal, whether present or not, was held erroneous, yet it is also held in that case this charge would not be reversible error if the facts were conclusive that appellant was actually present and participated in the offense.

In the LaFell case, supra, it is said: "As it will be seen, and the record manifests beyond question that appellant was not shown to have been present at the time and place that the animals were taken. He claimed to have bought the animals at Toyah, eighty miles away, and this is the first time his connection with the animals is shown by positive testimony; that his defense was an alibi—that he was at another and different place and had no guilty connection with the transaction when the offense was committed."

In the Drysdale case, supra, we held that the evidence did not raise the issue of accomplice, but showed that he was a principal, and affirmed the case. The question raised by appellant in this assignment is not mentioned nor discussed.

In the Silvas case, supra, it is stated his defense was an alibi, and that he purchased the beef he was found in possession of, and there was no positive evidence that he was present, and the State relied on circumstances to prove that fact.

To the rules of law announced in those cases—that where the evidence raises the issue that a person on trial may be an accomplice, an accessory or a receiver of stolen property, instead of a principal, and there is no positive evidence of his presence at the scene of the crime, the writer gives his assent, and does not question the correctness of the rule that holds such a charge erroneous under such circumstances, but our Presiding Judge does not agree to that enunciation of the law, and holds that the charge even in those instances would not be erroneous, and his views are expressed in the dissent in the Silvas case, supra. However, as the evidence in this case does not suggest that if appellant

is guilty of any offense he might be guilty as an accessory or accomplice, but the evidence and all the evidence shows that if appellant is guilty of any offense he is a principal in the transaction those cases do not sustain appellant's contention. In this case there is no evidence either that he was at a different place, having no connection with the transaction, but the evidence and all the evidence, including his own, shows that he was then at that specific time along engaged with others in the unlawful conspiracy, of which this killing was the offspring; he walked off about forty steps, and was guarding the other prisoner, thus doing acts in furtherance of the common design at the very time.

The above cases are all that are cited by appellant in support of this contention, but we might add there are others holding as those do.

In the case of Bollen v. State, 48 Texas Crim. Rep., 73, it was held that such a charge while erroneous, it was not hurtful because his testimony as well as that of the State shows he was present.

In the case of Henry v. State, 54 S. W. Rep., 592, it was held as the evidence showed the presence of the appellant at the place where the offense was committed, while inapplicable, such a charge presented no error for which the case should be reversed. In Glascow v. State, 50 Texas Crim. Rep., 635; Wright v. State, 40 Texas Crim. Rep., 45, and other cases, the same rule is announced.

In this case it is unquestionably shown that appellant was a party to the unlawful conspiracy to enter Mexico; that he was present when Buck and Ortiz were captured; that he was present when Sheriff Gardner was fired on; that he was present going with the crowd when Ortiz and Buck were tied and made to carry munitions of war; that he was present when Ortiz said he could not climb the hill and go any further, Buck stating that the following occurred: "Ortiz made an attempt and slipped back and he told him, 'If you people are going to kill me, kill me now. I can not climb the banks and I can not do what you want me to do like I am packed.' He said, 'If you are going to kill me, kill me now.' They got around him and said, 'You son-of-a-bitch, if you won't go we will kill you.' All of these men were around him there—the defendant was there, too, all of these men together. They argued there with him for about a second and the captain told them to go on and take me. So they taken me; all but the captain and three men stayed. This man (the defendant) was with me, guarding me with the others. After I walked forty steps I heard a volley of shots, about six or seven shots. So we walked on about ten steps further and came to a fence and they stopped, waiting for those people to come up, the captain and three men to come up, they all stopped." With such testimony in the record appellant had entered into the agreement with the others to enter Mexico, and appellant admitting that he was present on each and all of these occasions in his testimony, this part of the charge of the court could not have been hurtful to defendant if erroneous, but we do not think it erroneous in any case unless the evidence raises the issue that the defendant's connection with the offense may have been that of an accomplice, accessory or receiver of stolen property, or his defense is

an alibi, and the evidence in this case suggests none of these issues, and none of the cases cited by appellant announce any contrary rule of law in our opinion.

The judgment is affirmed.

*Affirmed.*

Davidson, Judge, dissenting.

[Rehearing denied June 10, 1914.—Reporter.]